Highway Express Lines, Inc. et al., Appellants,
*v.* Pennsylvania Public Utility Commission.

94

Argued March 24, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS,. MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Raymond A. Thistle, Jr.*, with him *Jerome Solomon, Paul F. Barnes*, and *Shertz, Barnes & Shertz*, for appellants.

*William A. Goichman*, Assistant Counsel, with him *Joseph I. Lewis*, Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Edward Goldberg*, for applicant, intervening appellee.

OPINION BY WOODSIDE, J., April 13, 1961:

This is an appeal from the order of the Pennsylvania Public Utility Commission amending the common carrier certificate of Breman's Transfer Company to permit it to transport, as a Class D carrier, property for A. P. Green Fire Brick Co. from its plant in the Borough of Tarentum, Allegheny County, to points in Pennsylvania and vice versa.

The application was opposed by 17 carriers. After a short form order was issued by the commission on August 22, 1960, granting the extended certificate of public convenience to the applicant (to which we shall hereafter refer as Breman), five of the protesting carriers appealed to this Court. As is the custom, the record was returned to the commission for a long form order, which it issued on January 4, 1961.

The appellants sought a supersedeas which this Court refused to grant. We did, however, issue a rule to show cause why a supersedeas should not be granted, and made it returnable at the time of the argument on the merits. As we are affirming the commission's order, the supersedeas is refused.

A. P. Green Fire Brick Co. (which we shall hereafter call Green), is engaged in the manufacture of refractory products used primarily in the construction and repair of industrial furnaces. It has plants, warehouses and offices throughout the United States. Its main office and plant is in Mexico, Missouri. Among its other plants is one in Ohio and another in Climax, Pa. It also has a distribution division in Philadelphia and warehouses in Titusville and Williamsport. It has contracts with several independent companies in Pennsylvania for exclusive distribution of its products, including one in Harrisburg and another in Sharpsburg. Green had been serving its Pennsylvania customers from the Climax plant and from plants outside of the Commonwealth.

In 1959, Green started construction of a large plant in the Borough of Tarentum, Allegheny County, for the manufacture and warehousing of basic refractory products. The plant was scheduled to be in production by June of 1960, and the company estimated it would be producing its products at the rate of 1000 tons a month for the balance of that year, and anticipated production of 2000 tons per month in 1961.

Refractory products, which are designed to withstand great heat, are used in industrial furnaces, particularly by the steel industry, the glass industry and the lime and cement industry.

For the present, Green will be shipping five types of refractory products: firebrick, mortar, castables, plastics, and ramming mixes. The firebrick and mortar are the basic ingredients in the construction and repair of industrial furnaces. These will be made at the Tarentum plant. The other products—castables, plastic, and ramming mix, referred to in the record as fireclay specialties,—will continue to be made at Green's other plants outside the state, but will be warehoused at the Tarentum plant and distributed from there to points in Pennsylvania. Approximately 70 per cent of the goods made or stocked at the Tarentum plant will be shipped to points in Pennsylvania, and the remaining 30 per cent will enter interstate commerce.

Upon the construction of its new plant in Pennsylvania, Green naturally made an investigation of the motor carrier service available to it for the shipping of its products. It was unable to find a carrier which had authority to deliver its products from its plant to all points in the Commonwealth. It found that its competitors, Harbison Walker Refractories and General Refractories, both had individual carriers with state-wide authority at their disposal. Green, thereupon, requested Breman, an experienced carrier with its principal place of business at Leechburg, ten miles from Tarentum, to apply for the rights involved in this case. Green recognized that it had three alternatives in shipping its products from Tarentum. It had to use many different truckers, or acquire its own trucks, or support the application of Breman or another carrier seeking similar rights. For reasons which we shall discuss later in this opinion, the use

of many different truckers would be inefficient, and would not meet the needs of the shipper. The fire-brick company had no desire of "going into the trucking business", although there is testimony that it was forced to do so at its Climax plant, presumably because the available carriers could not meet its needs.

In considering an application for a certificate of public convenience, such as presently involved, it is the duty of the Public Utility Commission to determine whether or not the granting of such certificate is necessary or proper for the service, accommodation, convenience or safety of the public. Public Utility Law of May 28, 1937, P. L. 1053, §203, 66 P.S. §1123. The order of the commission, setting forth its determination, must not be vacated or set aside by this Court, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or a violation of constitutional rights. Public Utility Law, supra, §1107, as amended, 66 P.S. §1437. See *D. F. Bast, Inc. v. Pa. P. U. C.*, 397 Pa. 246, 249, 250, 154 A. 2d 505 (1959); *Noerr Motor Freight, Inc. v. Pa. P. U. C.*, 180 Pa. Superior Ct. 62, 66, 118 A. 2d 248 (1955).

The application here is for rights as a Class D common carrier. President Judge RHODES speaking for this Court in *Chemical Tank Lines, Inc. v. Pa. P. U. C.*, 193 Pa. Superior Ct. 607, 620, 165 A. 2d 668, 674 (1960), said "There is little, if any, practical distinction between a Class D common carrier seeking authority to serve a particular shipper and a contract carrier." Although the application here was for rights as a Class D common carrier, what was said concerning contract carriers by Judge HIRT, speaking for this Court in *Coastal Tank Lines, Inc. v. Pa. P. U. C.*, 189 Pa. Superior Ct. 53, 57, 149 A. 2d 581 (1959), applies to this case. He said: "The Commission in disposing of an application for a contract carrier permit, must

consider existing common carrier service available to the shipper and, if that service is found to be 'satisfactory and adequate', whether 'the interjection of the contract carrier in competition with the satisfactory and adequate common carrier service would be detrimental to the public interest and to the inherent advantages of common carriage by motor vehicle': Wiley v. Pa. P. U. C.", 186 Pa. Superior Ct. 309, 318, 142 A. 2d 763, 767 (1958).

The commission was not convinced from the evidence, and we find no reason why it should have been, that the interjection of Breman in competition with the common carrier service would be detrimental to the public interest and to the inherent advantages of common carriage by motor vehicle. The commission has the power to authorize competition where it is necessary to provide adequate service. *Noerr Motor Freight, Inc. v. Pa. P. U. C.*, supra, 180 Pa. Superior Ct. 62, 118 A. 2d 248 (1955); *Coastal Tank Lines, Inc. v. Pa. P. U. C.*, supra, 189 Pa. Superior Ct. 53, 57, 149 A. 2d 581 (1959).

The evidence in this case, however, establishes that the existing common carrier service available to Green is inadequate and that the shipper needs the proposed service.

In the first place, there is no certificated carrier who has the right to haul throughout the State of Pennsylvania from Tarentum. There are places to which the present certificated carriers may not go from Green's plant.

Breman can furnish direct and through service to the customers of Green without the necessity of transferring or interchanging trailers with other carriers, and without the necessity of loading the trailers specially to conform to the routes of other carriers. It has been the policy of Green to combine shipments of less than truckload lots, which will be possible under

the authority of the order here appealed from, but would not be possible in many cases if the applicant's petition were denied. Breman will be able to haul the shipper's products to several points in one trip with dispatch and convenience to the public. See *Modern Transfer Co., Inc. v. Pa. P. U. C.,* 182 Pa. Superior Ct. 110, 115, 125 A. 2d 463 (1956). A carrier which can transport multiple shipments on one journey will produce savings in cost and time of delivery which will rebound to the public's benefit.

If Breman's application were denied, Green undoubtedly would have to use a number of different carriers. Not only would this be inconvenient but because of the limited dock facilities, Green would be unable to accommodate a number of carriers prepared to load at the same time.

It is important for Green to make prompt delivery to many of its customers who frequently desire service within a matter of hours. Breman is only 10 miles from Tarentum, closer than any of the appellants, and can have a truck at Green's plant for loading within 15 to 30 minutes. It is evident that to have a nearby carrier which can pick up on short notice and transport to various points in a continual movement will give Green and its customers a necessary service which would not be available if Breman's application were denied.

The evidence establishes that the products of the shipper require special handling which limits the available carriers which can transport its products, and would make transfer from one trucking company to another more difficult than the transferring of most products. The shipper's products are generally transported in packages of 3000 to 4000 lbs. formed by strapping the products to pallets with steel bands. The commission correctly noted in approving the application that "Green will have the services of a car-

rier familiar with its particular loading and packaging problems."

Furthermore, Green would be placed at an unfair competitive disadvantage if it were not to have the same privilege as its major competitors who have individual carriers with state-wide authority at their disposal.

Although Green does not intend to use Breman to the exclusion of all other carriers, there is no doubt that the inadequacy of the service which the other carriers have authority and ability to render makes it necessary for Green to have an immediately available carrier which has authority to haul anywhere in the Commonwealth.

The primary object of the Public Utility Law is not to establish monopolies or to guarantee the security of investments in public service corporations, but to serve the interests of the public. *Yellow Cab Co. v. Pa. P. U. C.*, 161 Pa. Superior Ct. 41, 50, 54 A. 2d 301 (1947). When the need for service is established, it is for the commission to determine which carrier can best fill that need. *Colombo v. Pa. P. U. C.*, 159 Pa. Superior Ct. 483, 487, 488, 48 A. 2d 59 (1946). Breman is an experienced carrier and its ability and reliability is not questioned.

Green requires steel, chemical additives and a few other products to be shipped *to* its plant. The pallets and some of its own products must be returned to the plant. The need for service from points in Pennsylvania *to* Green's Tarentum plant is less apparent from the evidence than the need for service *from* that plant, but there is sufficient evidence to support the need of the service to the plant. Certainly, it would be unreasonable to deny Breman the right to return the pallets, and the damaged, or unusable or rejected products made by Green and returned by its customers.

This case is similar in many respects to the recently decided case of *Chemical Tank Lines v. Pa. P. U. C.*, supra, 193 Pa. Superior Ct. 607, 165 A. 2d 668 (1960), in which the Pennsylvania cement industry was supporting the applications of various carriers to transport cement to all points in Pennsylvania from some twenty specifically designated plants of cement manufacturers. In that case the commission refused the applications. In spite of the efficacy of the commission's order, we reversed it because we felt that the evidence established a serious need on behalf of this important industry to better serve its customers, and that the best interests of the shipper and the public would not be realized were the applications denied. Having reversed the commission in that case, we entertain no doubt whatsoever that its order should be affirmed in the matter now before us.

The appellants contend that the applicant must show a *present* or *existing* need for the service, and that at the time the evidence was taken in this case, Green's plant had barely begun operation, and that no need then existed to transport any products under the proposed rights. It is argued that only a possible *future* need was shown, and that the commission may not grant rights to perform a service which the evidence did not show was *presently* needed.

Reference has been made in our opinions and in commission orders to the necessity of the appellant to establish a "present" or "existing" need for the proposed service. See *Follmer Trucking Co. v. Pa. P. U. C.*, 189 Pa. Superior Ct. 204, 211, 150 A. 2d 163 (1959).[1] The evidence must show a "present need" in the sense that rights should not be granted to carriers on the

---

[1] In this particular case, the "present" was used to distinguish from the past and not from the future, but "present" need is frequently mentioned in the law, presumably to distinguish from the future.

basis of prospective needs whose future existence is merely speculative.

Actually, all of the commission's orders granting rights to a carrier are to meet *future* needs, not *past* needs. It is, therefore, necessary for the commission to determine not what the needs were, but what the needs will be. One of the ways to determine future needs is to determine what past needs were, but this is not the only way to determine future needs. The mere construction of the plant by Green is evidence of a future need for service that did not exist prior to the plant's opening. When "present" need is referred to in this connection, the reference is not to the fleeting instant between the past and the future or even to the day or month in which the testimony is taken. Nor is present need limited to past need. Of course, the meaning of the expression as used in this connection cannot be precisely stated, nor can it be measured in exact units of time. But it must relate to a period of time involving the future as well as the past.

This is a rapidly moving world. The law and its administration must try to keep pace with the developments of commerce and business and science. The commission may not be chained to the past in determining the need for future service. It must not wait until the public suffers from the lack of service before it can authorize service which the evidence indicates will be necessary by the time a final order is made or within a reasonable time thereafter. For example, it would be ridiculous to hold that once new communities, such as Levittown and numerous smaller developments, were under construction, the commission could not anticipate a need for future taxi and bus service and could not grant rights to meet such need. Certainly, the commission could authorize such service without forcing the public to first endure the lack of it. If the need can be demonstrated only by

denying the services to the public long enough to prove its necessity, then the public is not being well served.

The same rule applies when a new industry is constructed or brought into the Commonwealth. If the evidence leads the comission to conclude with reasonable certainty that the new industry will have certain shipping requirements, the commission may act upon that indicated future need, and need not force the industry to suffer through months or years of unsatisfactory and inadequate shipping services in order to demonstrate the need. The time required to acquire an operative order is discouraging enough to shippers in need of a service which cannot be adequately supplied.[2] When the commission entered its long form order in January, it was dealing with evidence taken the prior April and May and relating to a situation existing at that time. That evidence showed with sufficient certainty what the needs of the shipper were likely to be in the immediate future, and the commission properly authorized the service necessary to meet those needs.

Order affirmed.

---

[2] Neither the commission nor this Court can be charged with undue delay in this case, but over a year has passed since the application was filed, and the case is still open for further legal action by the protesting carriers. The petition was filed in this case on March 4, 1960; the hearings were held by the commission in April and May, and its short form order was issued August 22. By the appeal to this Court, the issuance of the long form order by the commission was delayed to January 4, 1961. We heard argument on March 24, and are filing this opinion less than three weeks later. (In this case as in all cases, this Court is making every effort to keep the law in step with the pace of commerce and business, and to keep the Court's own work as current as adequate research, deliberation and reflection make possible.) As we refused a supersedeas, presumably Green has been receiving the service it desired from Breman, but the carrier still has no finally adjudicated order upon which it can make long range plans and equipment commitments.