580 A.2d 472

**LIMELIGHT LIMOUSINE, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 5, 1990.

Decided Sept. 28, 1990.

Gerald Gornish (Wolf, Block, Schorr and Solis–Cohen, of counsel), Philadelphia, for petitioner.

R.K. Smith, Asst. Counsel, with him, R. Knickerbocker Smith, Jr., Asst. Counsel, H. Kirk House, Deputy Chief Counsel, and John F. Povilaitis, Chief Counsel, Harrisburg, for respondent.

Rand Spear, with him, Timothy Costello, Edelstein, Martin & Spear, Philadelphia, for intervenor, Antonino Romeo d/b/a Transline Limousine Service.

Before DOYLE and SMITH, JJ., and BARRY, Senior Judge.

## OPINION

BARRY, Senior Judge:

Limelight Limousine, Inc. (Limelight or protestant) appeals from an order of the Pennsylvania Public Utility Commission (PUC or Commission) that adopted, with modifications, the Initial Decision of an Administrative Law Judge (ALJ) granting the application of Antonino Romeo (Romeo or applicant) to transport persons in airport transfer service.

Romeo filed an application with the PUC seeking authority to transport persons from points in the Counties of Philadelphia, Bucks, Chester, Delaware and Montgomery to the Philadelphia International Airport, North Philadelphia Airport and Wing Field. The applicant is the owner of a new van that he proposed to use in providing the described service. He had worked as a driver for several different companies providing airport transfer service in the Philadelphia area, most recently under a lease arrangement, for City Wide Limousine Service (City Wide).

Seven carriers filed protests to the application. After the applicant accepted restrictive amendments, five withdrew their protests. Limelight and Best Limousine, Inc. (Best) did not withdraw. An ALJ conducted four days of hearings on the protests between December of 1987 and August of 1988. The ALJ issued an Initial Decision granting the amended application. Limelight and Best filed joint exceptions. The PUC issued an opinion and order granting some of the exceptions but denying most of them and granting the authority sought with some modifications. Limelight has appealed from that decision.

The standards that the PUC has adopted for deciding motor common carrier applications are found at 67 Pa.Code § 41.14:

(a) An applicant seeking motor common carrier authority has a burden of demonstrating that approval of the application will serve a useful public purpose, responsive to a public demand or need.

(b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service, and, in addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally.

(c) The Commission will grant motor common carrier authority commensurate with the demonstrated public need unless it is established that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers to an extent that, on balance, the granting of the authority would be contrary to the public interest.

Limelight has challenged the PUC's findings and conclusions with regard to each aspect of the applicant's burden of proof under 67 Pa.Code § 41.14. Our focus here is on the PUC's conclusions regarding the applicant's "fitness" to perform the proposed service under § 41.14(b). As the Commission has held, "A determination of fitness always precedes the Commission's primary consideration of necessity for the proposed service when an initial application is before the Commission." *Re Chapman Johnson, Sr.*, 50 Pa.P.U.C. 697, 717 (1977).

As to the nature of the fitness determination, the Commission has said:

[T]he commission has adopted the following tripartite definition of fitness:

1. Technical expertise—Applicant must have technical capacity to meet the need in a satisfactory fashion....

2. Financial capacity—Applicant should possess the financial ability to give reliable and responsible service to the public....

3. Propensity to operate safely and legally—In this regard, lack of fitness is demonstrated by persistent disregard for, flouting, or defiance of the Public Utility Law and the commission's orders and regulations ... *and by violations in matters affecting the safety of operations....* For applicants who do not possess operating authority, the commission may consider any evidence which would bear upon the applicant's propensity to operate a public utility safely and legally.

*Re William O'Connor,* 54 Pa.P.U.C. 547, 549–50 (1980) (emphasis added).

■ At the final hearing before the ALJ, on August 9, 1988, the protestants presented their case. The first witness called by Limelight was a Mr. Al Meyers. This witness also worked as a driver for City Wide. The ALJ's summary of his testimony is in part as follows:

[Meyers] then began a long and circumstantial account of an altercation he had with the applicant, 'early in the evening of the 14th of last month' (July, 1988) (N.T. 287); 'we had a few words between us, an argument ... at the airport, terminal D'.

[On discovering applicant at terminal D, allegedly out of turn, Meyers spoke to the applicant.] 'I explained to him that we all have the same opportunity and he is not giving us an opportunity to work at these terminals' (because his van is always there) (N.T. 288). Words followed.

As stated by [Meyers] (at N.T. 289):

'I told him, he put his hand in my face, get out of my face, I don't want to talk to you. I said we are all working together here, all of us are entitled to make money. I pushed his hand back, we had a few words, I said take your best shot at me. I said don't do that to me, just keep your hands to yourself or you are going to get hurt.'

[After leaving the airport, Meyers believed that the applicant was following him. Meyers encountered a police officer and told him,] 'I think this guy might have a gun in his van'; the officer, he said, then stopped [applicant] and [Meyers] drove away 'and forgot completely about it' (N.T. 289).

[Meyers] had already indicated he lived in Northeast Philadelphia, but apparently didn't go straight home; at midnight he was 'coming over Magee Avenue approaching Algon (in Northeast Philadelphia); stopped for a light; 'the door of my van flew open, this man and another man whom I can't identify pulled me from this van ... they started to beat on me, ... I suffered multiple contusions ... and have a hospital record here ... I was knocked to the ground, I fell on top of him. I grabbed him by the head and I could have bashed his head down on the ground which I started to do and I figured I might kill this guy ... the other guy ran back to the truck they were in, pulled alongside ... started to come back, and I jumped off ... rolled to the side ... and they jumped in the truck and drove away.' (N.T. 289–291).

Unfortunately, his car was in gear when this started; it rolled down the street, 'made a U turn, and went into a parked car' and damaged it (N.T. 292).

There was no one in his van when he was pulled out, but the van itself had 'several thousand dollars worth of damage' (N.T. 291, 292).

He went to the hospital, made a report there, and also reported to City Wide that Mr. Romeo had attacked him (N.T. 292).

At the time of the attack, Romeo was not in his own van—it was a truck, and 'I don't know whose truck it was' (N.T. 292, 293).

He swore out a warrant for applicant with the police; the case hasn't as yet been heard. [Meyers] is still a driver for City Wide, one of five drivers (N.T. 293, 294).

[Meyers] didn't 'get a good look at the (other man's) face. When the two assailants drove off, 'they were in a truck, a stake truck, half ton stake' (N.T. 295); his van

was, at the time of hearing, in the process of being repaired (N.T. 296).

. . . .

Under cross-examination, Mr. Meyers stated his prior relationship with Mr. Romeo had been friendly; he knew that he had applied to the P.U.C.; that as of July 13, 1988 'that it was coming up, he hadn't received his decision' (N.Y. 305, 306).

[Meyers] called counsel for Limelight (who at the time was on vacation) on August 4, 1988, almost three weeks after this occurrence, having called Mr. Kahana (owner of protestant Limelight) after a conversation with Mr. Squires (owner of City Wide); he knew that Limelight was opposing the application (N.T. 307–309).

His call to counsel for Limelight coincided almost precisely with Mr. Romeo's departure from City Wide, which this witness previously testified was August 4, 1988 (see *supra*) taking place only four (4) days (including a weekend) before the instant hearing date.

[Meyers] confirmed that Mr. Romeo continued to work for City Wide *after* the July 13–14 incident, even though City Wide's owner was told about it, and about his reporting it to the police (N.T. 310), directly after it had occurred.

Initial Decision 39–43; Reproduced Record 65a–69a.

As Limelight emphasizes, although the applicant was present at the hearing, he did not deny the allegations of Mr. Meyers.

In his analysis of Meyers' testimony, the ALJ stated that he believed that the description of the original argument at the airport was true, but he noted that the stress of time constraints and competition among the drivers makes heated arguments not uncommon. The ALJ expressed reservations about Meyers' description of a police officer's stopping the applicant to question him. Concerning the alleged assault, the ALJ said:

That he was assaulted in Northeast Philadelphia, more than four hours later, is beyond question. But why did

he not name his assailant at the hospital? If it was Romeo, what was he doing in a half-ton truck? Where was his van?

We have no doubt that this assault was promptly reported to Mr. Squires, for whom the witness worked, and who would have to know about the extent of the damage to Mr. Meyers' van; but that owner's advice to this witness to contact Limelight can only be construed as covert hostility on his part toward the applicant and/or his application.

In view of his agreement (A–3) with his 'independent contractor', the applicant, under which City Wide was being handsomely compensated (see Paragraph 4), such conduct is explicable only if he hoped to see Mr. Romeo so reduced to destitution that he could seize the applicant's new van for default in the payments Romeo was obliged to make under that contract. The van was Romeo's, but was never described in the agreement as anything but 'the vehicle in question.' Nor can we be sure whether the owner instructed this witness to call Limelight at once, or to wait until shortly before the trial date of August 9, 1988. For these reasons, we are uncertain as to how much credibility can be accorded to this witness' claim of calling Mr. Kahana only a few days later.

Did City Wide wait until August 4, 1988 before terminating its agreement with applicant in order to supply its employee Meyers with evidence of illegal operation on applicant's part immediately prior to the hearing?

Did any part of this situation arise as a result of a protestant counsel call to Mr. Squires concerning John Lucchetti (see p. 34)? Why did Lucchetti not re-appear? [1]

There are too many unanswered questions raised by Mr. Meyers' testimony to create any real doubt in our

1. At the previous hearing, on May 5, 1988, applicant offered to call Mr. Lucchetti, another driver for City Wide, to testify as to a lack of service afforded to passengers to and from Philadelphia Airport. When protestants' counsel objected, claiming surprise, applicant's counsel offered to reserve his testimony for the next hearing. Initial Decision 33–34; R.R. 59a–60a.

minds about applicant's fitness except from a financial standpoint, and this witness' testimony was not directed to that aspect of 41.14(b) at all.

Initial Decision 69–71; R.R. 95a–97a.

Based on the foregoing analysis, the ALJ made the following Finding of Fact:

7. The testimony of the surprise witness offered by Limelight at the suggestion of the City Wide owner lacked sufficient credibility to establish a propensity on applicant's part to 'operate illegally' under 52 Pa.Code § 41.14(b). (N.T. 278 et seq.; and see Discussion, *supra*).

Initial Decision 76; R.R. 102a.

Among the various exceptions that Limelight and Best filed with the Commission to the ALJ's Initial Decision was one relating to this finding. The Commission's opinion and order addressed this exception as follows:

In their fourth Exception, Protestants argue that the ALJ's Finding of Fact No. 7 erred in not giving the testimony of Alfred Meyers sufficient weight to establish that Applicant is unfit. Mr. Meyers is a driver for City Wide and testified that Applicant and a friend assaulted him at a different location, after he and Applicant had a verbal confrontation over airport pick-up policy concerning vans. Mr. Meyers testified that he was injured in the assault and his van sustained several thousand dollars damage. Protestants note that Mr. Meyers filed a complaint with the police and that Applicant ceased working for City Wide about three weeks after the incident. Protestants argue that the ALJ ignored the important fact that Applicant did not refute this testimony. (Exceptions, pp. 9–10).

Applicant argues that Protestant's portrayal of the incident is highly misleading. Applicant notes that Mr. Meyers initiated the first physical contact and 'invited Mr. Romeo to "take his best shot." ' Applicant further notes that Mr. Meyers admitted that, when taken to the hospi-

tal, he did not identify Applicant as the assailant *and acknowledged that he did not get a good look at him.* This, contends Applicant, casts serious doubt upon the testimony of Mr. Meyers and led the ALJ to the proper conclusion that Mr. Meyers' testimony lacked sufficient credibility to establish Applicant's lack of fitness (Reply, p. 7).

We concur with Applicant that *the testimony concerning the alleged assault is not sufficiently clear as to whether or not Applicant was involved in the belated attack on Mr. Meyers.* Therefore, this exception is denied.

Opinion and Order 17–18; R.R. 124a–25a (emphasis added).

The portions of the Commission's opinion and order emphasized immediately above are not supported by the testimony of record as summarized and quoted in the decision of the ALJ. Although the record supports the statement that Meyers did not identify the applicant as his assailant to the hospital personnel, Meyers' testimony regarding not getting a good look at one assailant related only to the *second* alleged assailant, not to applicant. The Commission's statement constitutes a finding of fact that is not supported by substantial evidence, or any evidence, in the record.

On the basis of this unsupported finding, the Commission stated that the testimony of Meyers was not sufficiently "clear" as to whether applicant was involved in the alleged assault. The Commission's statement amounts to a legal conclusion that Meyers' testimony, *even if credited,* was not sufficiently definite to serve as the basis for a finding that the applicant assaulted him. That legal conclusion, based as it was on a misrepresentation of the testimony, was error. Meyers' allegations that the applicant assaulted him were completely clear and definite. The only issue regarding his testimony was that of credibility, not clarity.

The ALJ's finding on this point, quoted above, was expressed in terms of "credibility". Ordinarily, of course, credibility determinations by fact finders may not be disturbed on appeal. However, our Supreme Court has held

that this proposition is not absolute. In *D.F. Bast, Inc. v. Pennsylvania Public Utility Commission*, 397 Pa. 246, 154 A.2d 505 (1959), a carrier sought and received from the PUC increased authority to haul steel from the City of Bethlehem. The applicant showed need for the proposed service largely by evidence of its performance of the service for at least five years before the filing of the application, although its existing certificate permitted such service only in narrowly defined "emergencies". In this frequently cited case, the Supreme Court reaffirmed the principle that previous illegal service would not absolutely prohibit the acquisition of authority: if the illegal service were the result of a bona fide misunderstanding of the grant of authority from the commission, the service could be used as evidence of need in an application proceeding; if the illegal service resulted from a deliberate disregard of the certificate limitations or the law, it could not. *Bast*, 397 Pa. at 251, 154 A.2d at 508. On the issue of bona fide misunderstanding, the applicant's president testified: " 'I think there is emergency on steel now, even though the war is over ten years, there is still a state of emergency, isn't there?' " *Id.*, 397 Pa. at 252, 154 A.2d at 509.

The Supreme Court held:

Although the credibility of a witness is primarily for the Commission to determine, yet the acceptance by the Commission of Young's explanation that it misread its certificate and misconceived the meaning of an 'emergency' when this term was expressly and explicitly defined in the certificate cannot be approved nor can Young's excession of its certificated rights on the basis of a misunderstanding be excused. The record clearly and unmistakably demonstrates that Young operated its transportation service either with a definite knowledge of its lack of authority or with a complete indifference to the extent of its authority—in either event an attitude of deliberate defiance of the law.

*Id.*

In our view, the present case is similar to *Bast*. Here the ALJ explained his decision not to credit Meyers, but the

explanation shows that the decision was based entirely on the ALJ's speculation concerning matters not directly related to the content of the testimony, and, in some cases, not of record at all. The ALJ questioned Meyers' identification of applicant because the alleged assailants were said to be in a truck rather than applicant's van. His reasoning on this point is impossible to fathom. The ALJ *credited* the portion of Meyers' testimony concerning his promptly reporting the assault to the owner of City Wide, but stated that the owner's advice to Meyers to contact Limelight showed hostility on the owner's part toward the applicant. Although that conclusion may be correct, the ALJ failed to explain how it had any bearing on the question of whether Meyers' testimony was truthful.

The ALJ then indulged in further speculation concerning a possible motive on the part of City Wide's owner to wish to see the applicant reduced to destitution so that the owner could seize the applicant's new van for default in the payments applicant was making under their contract. The contract itself, Exhibit A–3, R.R. 20a–26a, speaks only of City Wide's right to terminate in the event of such a default, not of any right to seize applicant's van. The ALJ questioned why the owner of City Wide waited until shortly before the hearing to terminate its agreement with the applicant, whether "any part of this situation" arose as a result of a telephone call from counsel for Limelight to the owner of City Wide concerning the City Wide driver who was to testify on applicant's behalf, and why that witness did not re-appear at the final hearing. The ALJ then concluded that *Meyers' testimony* raised "too many unanswered questions" to create any doubt about applicant's fitness except from a financial standpoint.

Obviously, the "unanswered questions" arose from the ALJ's speculations concerning unrelated matters not of record, rather than from Meyers' testimony itself. Because the PUC's decision in this case involved an error of law, as discussed above, there never has been a proper determina-

tion of the validity of the extremely serious allegations made by Meyers.

The statutory provision pursuant to which the PUC adopted its regulation relating to standards for motor carrier applications, noted above, is Section 1103 of the Public Utility Code, 66 Pa. C.S. § 1103, which provides in part:

> **(a) General rule.—** . . . . A certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public.

Courts of this Commonwealth have long recognized the importance of the Commission's responsibility to regulate common carriers so as to protect the safety of the public. In *Byham v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 253, 67 A.2d 626 (1949), the Superior Court reviewed the PUC's denial of an application for authority to transport persons as a common carrier in call and demand service. The PUC considered the applicant's evidence concerning the equipment that he planned to use and his experience as well as protestant taxicab company's evidence concerning the size and efficiency of its operation. In addition, the PUC considered the applicant's record of arrests on numerous occasions between 1942 and 1946 for drunkenness and disorderly conduct. The Superior Court held:

> The Commission did not err in giving consideration to appellant's record of prior convictions. Determination by the Commission of the merits of an application for a certificate of public convenience requires that it scrutinize the fitness of the applicant. *This fact is particularly important where taxicab privileges are sought.*

*Byham*, 165 Pa. Superior Ct. at 258, 67 A.2d at 629 (emphasis added).

The transportation of persons in call and demand airport transfer service, which is the subject of the present case, involves constant contact with the public and attendant

concerns about ensuring the safety of those members of the public every bit as much as does the operation of a taxicab. The Commission's error of law in deciding the fitness issue raised by Meyers' allegations on the basis of a finding and conclusion lacking any support in the record, and the ALJ's credibility determination expressly based on improperly speculative considerations, failed to provide the scrutiny of this applicant's fitness required under Section 1103 and *Byham.*

The Commission, in its brief to this court, raises a novel argument in relation to this issue. The Commission notes that the record here is devoid of evidence that the applicant was brought to trial on the criminal charges filed by Meyers. Referring to *Byham,* the Commission states that the holding there was that the Commission did not err by considering the applicant's record of prior *convictions.* Citing *Secretary of Revenue v. John's Vending Corp.,* 453 Pa. 488, 309 A.2d 358 (1973), and *Barnett v. Unemployment Compensation Board of Review,* 47 Pa.Commonwealth Ct. 360, 408 A.2d 195 (1979), the Commission states that the Pennsylvania Supreme Court has set specific guidelines for governmental agencies' review of past criminal records where they could have an impact on an individual's right to engage in lawful employment, although the Commission does not specify what those guidelines are. From these two propositions the Commission concludes that "[a]bsent the introduction of certified records of relevant criminal convictions, the Commission is justified in refusing to consider mere untried criminal allegations which impact on the issue of fitness in application proceeding [sic]." Brief of Respondent at 15.

In *John's Vending Corp.* the Supreme Court reversed the revocation of a corporation's wholesale cigarette dealer's license for failure of the former president to list on the application his convictions, almost twenty years earlier, of certain crimes involving moral turpitude. That failure violated provisions of the former Pennsylvania Cigarette Tax

Act,[2] adopted after the application was made, that prohibited persons with such convictions from obtaining licenses. The court held that the act could not reasonably be read to constitute a blanket prohibition barring anyone from obtaining a license regardless of the remoteness of the convictions or the individual's subsequent performance. In *Barnett* this court affirmed the denial of unemployment compensation benefits to a claimant who was discharged for willful misconduct when his employer, a division of the Department of Public Welfare, learned that he did not respond truthfully concerning former convictions on his original application, when he was hired as a food service worker, and in questioning related to his later promotion to a supervisory position. We noted that in cases involving concealment or falsification of background information the conduct must be deliberate and the information must be material to the qualifications of the individual for the job. We held that the employee's second falsification directly related to his honesty and integrity, which in turn directly related to his qualifications for employment in a position requiring supervision of other employees and of valuable equipment and goods.

The principle that extremely remote criminal convictions should not absolutely bar an applicant with an otherwise clear record from obtaining a license has no application to the present case, where the conduct alleged occurred during the pendency of the application. The principle that a job applicant does not commit willful misconduct so as to justify his discharge, for purposes of determining eligibility for unemployment compensation, if he conceals background information not material to his qualifications has no application to the present case whatsoever.

■ The fact that the PUC may deny an application for a certificate of public convenience on the basis of prior convictions does not logically lead to a conclusion that the PUC

2. Act of July 22, 1970, P.L. 513, *formerly* 72 P.S. §§ 3169.101 to 3169.1203, repealed by the Act of December 21, 1981, P.L. 482, 72 P.S. § 8297.

may *not* deny a certificate *unless* it is presented with proof of a conviction. If that were the case, then the PUC would be "justified" in declining to consider evidence that a taxicab operator who had applied for increased authority was under indictment for assaulting a passenger. The Public Utility Code and the decisions of the courts of this Commonwealth impose a duty on the Commission to protect the safety of passengers of common carriers of persons by motor vehicles. The Commission fails to perform that duty when it fails to give proper consideration to allegations of serious misconduct directly relating to the propensity of an applicant to operate safely and legally.

As noted by protestant Limelight, the allegations here do not involve mere spontaneous fisticuffs in the course of a heated argument during working hours. Rather, the allegations are of a premeditated attack hours after and miles away from the original confrontation. In addition, the assault here allegedly was carried out in a manner that resulted in an unoccupied van's rolling down a city street until it crashed. A person who employed such methods to resolve work-related problems necessarily has no propensity to operate safely and legally. Should a determination be made that substantial evidence supports these allegations, then the PUC could not both grant the application and perform its statutory duty to protect the safety of the public.

We shall vacate the Commission's decision because the PUC decided this crucial issue on the basis of a finding and conclusion not supported in the record. We shall remand with instructions for the Commission to perform a proper analysis of the extremely serious allegations directly related to the question of the applicant's propensity to operate safely and legally. Such an analysis might well entail eliciting testimony from the applicant either admitting or denying the allegations of Meyers. Should the PUC conclude, on the basis of substantial evidence in the record, that the allegations are not true, this court would be bound to respect such a decision on appeal. Should the Commis-

sion conclude that they are, then we believe that it could not properly grant the application. We do not ask the PUC to determine the applicant's guilt or innocence of criminal charges. We simply wish the Commission to give serious and thorough consideration to allegations that have arisen in the course of an application proceeding that unquestionably relate to the issue of the applicant's fitness to perform the service for which he has sought authority.

### ORDER

NOW, September 28, 1990, the order of the Pennsylvania Public Utility Commission at Docket No. A–00107618, entered August 7, 1989, is vacated. This case is remanded to the Commission to order proceedings sufficient to permit a proper determination of the fitness of the applicant in accordance with the attached opinion.

Jurisdiction relinquished.