**LEHIGH VALLEY TRANSPORTATION SERVICES, INC.,
Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 11, 2012.
Decided Oct. 10, 2012.

Craig A. Doll, Hummelstown, for petitioner.

Heidi L. Wushinske, Assistant Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, President Judge, and COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

When J & J Leasing & Rentals, Inc., d/b/a Anytime Airport Taxi by J & J Luxury Transportation (J & J) requested that the Pennsylvania Public Utility Commission (PUC) add "call and demand taxi services" to its existing services, two competitors protested. After a hearing, an

Administrative Law Judge (ALJ) approved the addition of these services, and the PUC subsequently denied the competitors' exceptions. On appeal, we hold that the PUC did not err in finding that: (1) J & J met its burden of proving a present public need for the additional call and demand taxi services; and (2) that J & J does not lack the propensity to operate safely and legally.

On February 19, 2010, J & J filed an application (Application) with the PUC to amend its certificate of public convenience to add call and demand taxi services to its existing services.[1] Notice of the Application was posted in the Pennsylvania Bulletin, and two competitors, Lehigh Valley Transportation Services, Inc. (Lehigh) and Quick Service Taxi Company, Inc. (Quick Service), filed timely protests. The matter was assigned to an ALJ to hold hearings. J & J, Lehigh, and Quick Service presented both testimony and documentary evidence.

In order to add the call and demand taxi services, J & J had to meet the requirements in Section 1103(a) of the Public Utility Code (Code), 66 Pa.C.S. § 1103(a), and

Section 41.14 of the regulations, 52 Pa. Code § 41.14. At issue is whether J & J initially met its burden of proving that there was a present public need for the services, (Section 1103(a)), and whether the protestors thereafter met their burden of proving that J & J lacks a propensity to operate safely and legally, (Section 41.14(b) of the PUC's regulations).

At the hearing J & J presented fact witnesses, who testified in support of the present need for additional call and demand taxi services, and J & J's Vice President of Operations, Denise Sam Cali, who testified about J & J's finances, facilities, all aspects of its operations, and introduced numerous exhibits in support of J & J's Application. Lehigh and Quick Service cross-examined J & J's witnesses and presented witnesses of their own and some documentary evidence in opposition to the Application.

J & J's witnesses testified about the need for call and demand taxi services. Some testified that they would use these services either for themselves, for family members, or business clients.[2] Some testi-

---

**1.** J & J currently holds authority from the PUC and the Interstate Commerce Commission (succeeded by the Federal Motor Carrier Safety Administration of the U.S. Department of Transportation) for para-transit services, intrastate and interstate limousine services, airport transfer services, interstate taxi services, and group and party services. (PUC Op. at 2.)

**2.** For example, one witness testified that he lives in Northampton County and, although he does not currently use a cab service, would use the proposed service because he has macular degeneration, cannot drive to and from his medical appointments in Bethlehem, Northampton County, and will gradually lose his ability to drive. The witness would also use the service to help his neighbor, for whom he currently drives. The witness testified that he has used J & J's airport services, he was satisfied with those services, and thought that

he was charged a flat fee. (Hr'g Tr. at 24, R.R. at 8a.) Another witness, who also lives in Northampton County, indicated that, although he does not currently use a cab service, he would use the proposed service to take his wife to dinner in Easton and Bethlehem—both in Northampton County—approximately once a week. The witness stated that he used J & J's airport services, which were very satisfactory, and would prefer to use the call and demand service to go out to dinner because it is less expensive than J & J's limousine service. A third witness, who lives in Lehigh County, testified that she would use the proposed service once a month to attend social events in Lehigh and Northampton counties and would use the proposed service for her sons when they are home. The witness stated that she has used both Lehigh and Quick Service in the past, and while some of the service was satisfactory, some was not, including a time when Quick Service did not

fied either that they have used Lehigh or Quick Service in the past, but were not satisfied with the service, or that they would not use Lehigh or Quick Service based on concerns about the safety or cleanliness of the vehicles, the "unkempt" appearance or attitude of the drivers, or because they were told that those businesses did not provide service to where the witness lived. Additionally, J & J presented a list of individuals who had contacted them for call and demand services, which J & J referred to other providers. (FOF ¶¶ 26–35; J & J Ex. 16, PUC Br. at Appendix A.)

Additionally, J & J offered the testimony of Ms. Cali, the supervisor of J & J's finances, employees, facilities and vehicles, and who submitted numerous exhibits which were admitted into the record. J & J has the necessary federal permits to provide interstate services and has been licensed by the PUC since 1985 to provide limousine, group and party service, paratransit, and airport transfer services. J & J employs approximately 80 drivers, who, together, speak five different languages. Those drivers must pass a pre-employment examination and receive on-the-job training before they can drive for J & J, the drivers must maintain all the licenses required to operate the appropriate vehicles,[3] and J & J requires ongoing testing, training, and evaluations of its drivers. Additionally, J & J uses mystery shoppers to evaluate its drivers, and has rules and a program to address driver training, accidents, vehicle maintenance, and safety. J & J maintains all of the necessary bodily injury and property damage insurance on its vehicles, and already has the meters necessary to provide the call and demand service. J & J operates 24 hours per day, 7 days per week, year round from its offices in Allentown, where 14–16 people work, including day and night supervisors, bilingual dispatchers, 4 mechanics who are on call 24 hours per day, and a safety supervisor. Ms. Cali testified as to J & J's financial particulars, which are not at issue in this appeal. J & J has received two PUC complaints, one of which was withdrawn by the PUC and the other was resolved by settlement. There was no evidence that J & J, or any of its drivers, have been convicted of a crime of moral turpitude and remains under the supervision of a court or prison. (FOF ¶¶ 1–8, 10–17.)

In opposition to J & J's request, Lehigh's General Manager (General Manager) testified that, on January 29, 2011 and April 9, 2011, he was solicited by individuals who offered to provide transportation to him from the Sands Casino in Bethlehem to a non-airport location in vehicles marked for J & J's airport transport service. (Hr'g Tr. at 165–72, R.R. at 85a–92a.) A consultant for Lehigh testified that a person, who proffered a J & J business card but did not have a J & J marked vehicle, transported him for a flat $10.00 fee, rather than a rate based on mileage. (FOF ¶¶ 18–20.) Quick Service's evidence revealed that its services are not co-extensive with those J & J seeks, as

---

arrive to pick her up. She also used J & J's services in the past, but would prefer to use the taxi service rather than the limousine service; she indicated that it was her belief that she was charged a flat rate for her prior use of J & J's limousine service. Ten other witnesses, who reside in Lehigh or Northampton County, offered similar testimony. (ALJ's Decision, Findings of Fact (FOF) ¶¶ 23–25.)

3. J & J currently leases 17 sedans, 14 limousines, 3 stretch SUVs, 8 vans, 5 small luxury vans, and 6 4–wheel drive SUVs. J & J would use 5 of the sedans to operate the proposed call and demand taxi service. (FOF ¶¶ 9–10.)

Quick Service cannot provide services in Northampton County. Quick Service receives calls for services at the Lehigh Valley International Airport and sends one to five taxis there each day. Lehigh and Quick Service also presented copies of J & J's on-line and telephone book advertising, which were unclear exactly what call and demand services (interstate or intrastate airport transfer service) are being offered by which J & J entity, Anytime Taxi by J & J or Anytime Airport Taxi by J & J. (FOF ¶¶ 20–22.)

The ALJ determined, in relevant part, that J & J satisfied its burden of proving that there was a current public need for the proposed service and that the witnesses represented a cross-section of the public to whom the services would be offered. The ALJ also found that J & J, as a current certificate holder, is entitled to the continuing presumption of fitness to perform its services, citing *In Re Blue Bird Coach Lines, Inc.*, 72 Pa.P.U.C. 262, 274, 0090 WL 10556057 (1990). The only fitness requirement at issue, as set forth in Section 41.14 of the regulations, is whether J & J had the propensity to operate safely and legally. Although Lehigh and Quick Service argued that J & J, in charging flat rates for its limousine and group/party services, violated its tariff, and J & J violated its certificate when it offered call and demand service to non-airport bound riders, the ALJ concluded that the cited isolated incidents did not indicate that J & J has the propensity to operate illegally. (ALJ Decision at 34–36, R.R. at 222a–24a.) The ALJ noted Ms. Cali's testimony that she would not tolerate such behavior, had not heard of these allegations before the hearing, would investigate and, if necessary, discharge drivers if warranted. Although the ALJ was troubled by the allegations that J & J may have charged rates different than its tariff, she concluded that the testimony was vague, did not indicate

what fare was actually charged and, therefore, was insufficient to show that J & J has a "persistent disregard for, flouting, or defiant attitude toward the [Code], or orders and regulations of the [PUC]." (ALJ Decision at 35, R.R. at 223a.) Similarly, the ALJ indicated that, while the advertisements should have been clearer about what services were being offered by which J & J entity, Ms. Cali testified that the website was a work in progress, there were errors on the website, and there had been some confusion initially as to what services J & J could provide. (Hr'g Tr. at 155–57, R.R. at 81a–83a.) For these reasons, the ALJ concluded that the record did not contain sufficient evidence to rebut the presumption of J & J's continuing fitness to operate and, therefore, recommended that the PUC grant the Application.

Lehigh filed exceptions to the ALJ's determination, in which Quick Service joined, asserting that the ALJ erred in finding a present need for the proposed service and that J & J had the propensity to operate safely and legally. In its first exception Lehigh argued, based on *Ace Moving & Storage, Inc. v. Public Utility Commission*, 935 A.2d 75 (Pa.Cmwlth.2007), that the need witnesses had to be "actual users," not users who would be recommending the service to someone else or paying for the service for someone else. Lehigh stated that there "must be more than a professed possibility that if a service was available by a specific individual[,] the witness [']might['] utilize that service," and it would be "illogical to assume that a service is reasonably necessary" because the witnesses testified that they have not used call and demand services and did not know that such services were available. (Exceptions at 4, R.R. at 239a.) In its second exception, Lehigh challenged the ALJ's determination that J & J has the

propensity to operate safely and legally, noting that J & J has had a PUC certificate since 1985 and still violated its tariffs and its certificate by offering flat rates and de facto call and demand taxi services. Lehigh argued, *inter alia*, that the ALJ erred in placing the burden on it and Quick Service to rebut the presumption of fitness and prove that J & J was not fit. Rather, according to Lehigh, the burden should have been placed on J & J, and J & J did not satisfy its burden. According to Lehigh, J & J has a pattern of disregard for the Code, the PUC's regulations, and its tariff, which demonstrates that it is not fit to operate a call and demand service.

The PUC reviewed the record and, for the most part, adopted the ALJ's findings of fact and conclusions of law. The PUC denied Lehigh's first exception, finding that the witness testimony cited by the ALJ "was credible and probative and, considered as a whole, more than sufficient to establish" a public need for the proposed services. (PUC Op. at 8.) The PUC concluded that *Ace Moving & Storage* supported the ALJ's determination because J & J presented thirteen public witnesses who testified to present and future needs for the proposed service in Lehigh and Northampton Counties, twelve of whom had present taxi needs and were satisfied with J & J's other services. Furthermore, the PUC pointed to the people who contacted J & J about call and demand services, who J & J referred to other entities.

■ The PUC also denied the second exception, concluding that the evidence presented did not, when taken as a whole, establish that J & J demonstrated "a persistent disregard for, flouting, or defiant attitude toward the [Code], or orders and regulations of the [PUC]." (PUC Op. at 11–12.) The PUC agreed with the ALJ that there was no uncontroverted evidence of J & J charging other than their lawful tariff rate. The PUC also noted that Ms. Cali testified that she was aware of only two complaints in the past year, one of which was withdrawn and one that was settled. Finally, the PUC held that any errors that may have existed on J & J's website as to its services were not authorized and were being corrected. Lehigh now petitions this Court for review, raising the same two arguments it raised before the PUC.[4]

■ J & J had to comply with Section 1103(a) of the Code, which provides that an application for a certificate of public convenience should be granted only if the PUC finds that "the granting of such certificate is necessary or proper for the service, accommodation, convenience or safety of the public." 66 Pa.C.S. § 1103(a). The applicant must also satisfy the specific requirements the PUC has promulgated in its regulations, 52 Pa.Code § 41.14.[5] J & J, as the party requesting

---

4. On appeal from the granting of a certificate of public convenience by the PUC, this Court's "inquiry is as to whether [the PUC's] orders granting certificates of public convenience should be vacated or set aside for error of law or lack of supporting evidence or for violation of constitutional rights." *Department of Environmental Resources v. Public Utility Commission*, 18 Pa.Cmwlth. 558, 335 A.2d 860, 863 (1975). Quick Service intervened in the present appeal and adopts Lehigh's Brief as its own. J & J adopts the PUC's brief as its own.

5. In its entirety, Section 41.14 provides:

§ **41.14. Evidentiary criteria used to decide motor common carrier applications to statement of policy.**

(a) An applicant seeking motor common carrier authority has a burden of demonstrating that approval of the application will serve a useful public purpose, responsive to a public demand or need.

(b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed

approval of the Application, must prove by a preponderance of the evidence that the requirements of Section 1103(a) and Section 41.14 are met.[6] *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission,* 134 Pa.Cmwlth. 218, 578 A.2d 600, 602–03 (1990). "[T]he PUC's interpretations of the Code, the statute for which it has enforcement responsibility, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous." *Energy Conservation Council of Pennsylvania v. Public Utility Commission,* 995 A.2d 465, 478 (Pa.Cmwlth.2010). We are mindful that, "[w]hen reviewing a PUC decision, the Court should neither 'substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the [PUC's] expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony." *Id.* (quoting *Popowsky v. Pennsylvania Public Utility,* 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997)). " '[A] public demand/need for an applicant's proposed transportation service may be proven through witnesses comprising a representative sampling of the public that will use the applicant's proposed service within the territory encompassed by the application.' " *Ace Moving & Storage,* 935 A.2d at 78 (quoting *Blue Bird,* 72 Pa.P.U.C. at 274). In proving a public need for the services, the "witnesses must be legally competent and credible; their testimony must be probative and relevant to the application, and they must articulate a demand/need for the type of service embodied in the application." *Yellow Cab Company of Pittsburgh v. Pennsylvania Public Utility Commission,* 673 A.2d 1015, 1018 (Pa.Cmwlth.1996).

■ Lehigh argues that the testimony presented by J & J witnesses does not meet the burden of proving the present public need for the services. Instead, Lehigh claims that the testimony was similar to the testimony found lacking in *Ace Moving & Storage* because it was speculative and merely stated the witnesses would be referring J & J's services to others, i.e.,

service. In addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally. In evaluating whether a motor carrier applicant can satisfy these fitness standards, the [PUC] will ordinarily examine the following factors, when applicable:

(1) Whether an applicant has sufficient capital, equipment, facilities and other resources necessary to serve the territory requested.

(2) Whether an applicant and its employees have sufficient technical expertise and experience to serve the territory requested.

(3) Whether an applicant has or is able to secure sufficient and continuous insurance coverage for all vehicles to be used or useful in the provision of service to the public.

(4) Whether the applicant has an appropriate plan to comply with the [PUC's] driver and vehicle safety regulations and service standards contained in Chapter 29 (relating to motor carriers of passengers).

(5) An applicant's record, if any, of compliance with 66 Pa.C.S. (relating to the Public Utility Code), this title and the [PUC's] orders.

(6) Whether an applicant or its drivers have been convicted of a felony or crime of moral turpitude and remains subject to supervision by a court or correctional institution.

(c) The [PUC] will grant motor common carrier authority commensurate with the demonstrated public need unless it is established that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers to an extent that, on balance, the granting of authority would be contrary to the public interest.

52 Pa.Code § 41.14.

**6.** A preponderance of the evidence means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party. *O'Toole v. Borough of Braddock,* 397 Pa. 562, 564, 155 A.2d 848, 850 (1959).

their elderly relatives, their children, their houseguests, etc. In *Ace Moving & Storage,* a moving company (Shannon) sought to expand its certificate of public convenience to allow it to move household goods within Pennsylvania. To support its application, Shannon presented evidence that realtors at three realty companies wanted to recommend Shannon to their clients to transport the clients' household goods. The ALJ held that Shannon had satisfied its burden of proving a public need for the proposed services, and the PUC modified the ALJ's determination and affirmed the grant of the certificate of public convenience. On appeal to this Court, the protestants argued that the evidence Shannon submitted was insufficient to show that there was a present need among *actual* users of the proposed service. We agreed, reversed the PUC's order, and held that the testimony presented was not based on a desire to satisfy the *realtors'* own needs, but to satisfy the alleged needs of the realtors' clients and, therefore, was not evidence of requests by actual potential customers.

However, J & J's evidence does not suffer from the same deficiency as the evidence in *Ace Moving & Storage.* J & J's witnesses testified that they would use J & J's call and demand services on a weekly to monthly basis for themselves, their relatives, and their houseguests. Although some testified that they had not previously used call and demand taxi services, this is not determinative. *Highway Express Lines, Inc. v. Pennsylvania Public Utility Commission,* 195 Pa.Super. 92, 169 A.2d 798, 803 (1961) (in determining the present need for a proposed service, the PUC must "determine not what the needs were, but what the needs will be.") Looking at past need is only one way of estimating future needs. *Id.* Lehigh's argument is, essentially, that because these particular witnesses did not express a past need for call and demand services, the witnesses cannot demonstrate a present need for those services. Lehigh appears to disregard the other J & J witnesses who testified that they *had* used the existing providers and were not satisfied, or were aware of the existing providers but would not use those services because of the lack of access, driver attitudes, cleanliness, and safety concerns. In addition, their testimony of what their needs are and will be supports the PUC's determination of a present need. Notwithstanding that most of the witnesses testified that they would be using the services for themselves, the others testified that they would use the service for people for whom the witnesses would otherwise be responsible for providing transportation. For example, several witnesses testified that they would call and pay J & J to transport their elderly relatives to medical appointments. Another witness stated that he would call and pay J & J to pick up his daughter, who sometimes called him late at night, rather than having to go and pick her up himself. Similarly, a third witness testified that she would call J & J to take guests home from her parties, rather than she having to drive them home. The witnesses did not testify that they would recommend J & J to another, who might independently contact J & J, as was the case in *Ace Moving & Storage,* but rather that J & J would satisfy the witnesses' own needs. In addition, Ms. Cali presented a list of requests J & J received for call and demand services, which J & J had to refer elsewhere. "Requests for service can constitute evidence that this Court has held to be reliable to establish proof of need for service." *Ace Moving & Storage,* 935 A.2d at 77. Accordingly, through this credited evidence, J & J established that there is a present need for the proposed call and demand services.

Lehigh next argues that the PUC erred in finding that J & J had the propensity to operate safely and legally as required by Section 41.14(b) of the PUC's regulations. Section 41.14(b) includes the caveat that operating "authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally." 52 Pa.Code § 41.14(b). At issue, is the interpretation of this caveat.

 J & J is an existing certificate holder; therefore, we begin by noting that as such, J & J is entitled to a continuing presumption regarding its fitness to operate. *South Hills Movers, Inc. v. Pennsylvania Public Utility Commission*, 144 Pa. Cmwlth. 505, 601 A.2d 1308, 1310 (1992). It is therefore Lehigh and Quick Service, as the parties challenging J & J's Application, who bear the burden of rebutting this presumption. *Id.* In addition to evidence of its current certification, J & J presented evidence of its finances, its employees and their training, its vehicles, and details of its operations. The PUC also reviews "[a]n applicant's record, if any, of compliance with 66 Pa.C.S. (relating to the Public Utility Code), this title and the [PUC's] orders." 52 Pa.Code § 41.14(b)(5). The credited evidence satisfied J & J's initial burden of showing it is technically and financially fit to operate. The burden then shifted to the protestants to show that the authority should be withheld because J & J "lacked the propensity to operate safely and legally." 52 Pa.Code § 41.14(b).

 The PUC interprets the phrase "lacks a propensity to operate safely and legally," to mean a "persistent disregard for, flouting, or defiant attitude toward the [Code], or the orders and regulations of the [PUC]," (PUC Op. at 11–12 (quoting *Application of Central Transport, Inc.*, Docket No. A–00108155 (Order entered June 26, 1992))). Lehigh asserts that the PUC should not have applied its interpretation as set forth in *Application of Central Transport, Inc.* However, an agency's interpretation of its own regulation is entitled to deference unless clearly erroneous. *Energy Conservation Council*, 995 A.2d at 478. The term "propensity" is not defined in the Code, but it has been defined as "a natural inclination: innate or inherent tendency." Webster's Third New International Dictionary 1817 (2002). An applicant's inadvertent or isolated violation of the Code or its certificate does not demonstrate that it is naturally inclined or has an innate tendency to operate unsafely or illegally. We conclude that it is not clearly erroneous for the PUC to require that, in order to rebut a determination of an applicant's fitness to operate, a challenger must demonstrate that the applicant has a "persistent disregard for, flouting or defiant attitude," *Application of Central Transport, Inc.*, before that applicant is considered to have a propensity, i.e., a natural inclination or innate or inherent tendency, to operate outside of safety and the law. Accordingly, we will defer to the PUC's interpretation.

Lehigh also argues that the PUC should have given more consideration to its allegations of J & J's misconduct and that its allegations are similar to those in *Limelight Limousine, Inc. v. Pennsylvania Public Utility Commission*, 135 Pa. Cmwlth. 316, 580 A.2d 472 (1990). In *Limelight Limousine*, during hearings on an application to operate an airport transport service, a former co-worker testified that several hours after he and applicant got into an argument regarding picking up fares at an airport terminal, the applicant and another person physically attacked him, beat him up, and caused the witness's van to coast down the street. The witness acknowledged that he did not get a good look at the second person who attacked him and testified that, following the attack,

he spoke with his employer, who eventually put the witness in touch with the challengers to applicant's application. The ALJ: questioned the veracity of the witness's testimony because he testified that he did not get a good look at his attackers and, therefore, could not be sure the applicant was involved; speculated as to why the witness and applicant's former employer contacted the challenger's attorney; and speculated as to why certain other witnesses did not testify in the matter. Accordingly, the ALJ granted the application, and the PUC affirmed. On appeal, we determined that the basis for the ALJ's and PUC's rejection of the witness's testimony was not supported by the record and that the ALJ impermissibly relied upon speculation regarding questions not before him to reject that testimony. Therefore, we vacated the order and remanded to the PUC to reconsider that testimony. In doing so we stated:

> The fact that the PUC may deny an application for a certificate of public convenience on the basis of prior convictions does not logically lead to a conclusion that the PUC may *not* deny a certificate *unless* it is presented with proof of a conviction. If that were the case, then the PUC would be "justified" in declining to consider evidence that a taxicab operator who had applied for increased authority was under indictment for assaulting a passenger. The [Code] and the decisions of the courts of this Commonwealth impose a duty on the [PUC] to protect the safety of passengers of common carriers of persons by motor vehicles. The [PUC] fails to perform that duty when it fails to give proper consideration to allegations of serious misconduct directly relating to the propensity of an applicant to operate safely and legally.

*Id.* at 479 (emphasis in original).

Lehigh contends that its allegations of J & J's misconduct, including the existence of complaints against J & J, that J & J did not comply with its tariffs and present certificate, and that J & J advertised services beyond the scope of its authority, were more than sufficient to demonstrate that J & J does not have the propensity to operate safely and legally. According to Lehigh, the fact that J & J has never been found to have violated the Code, regulations, or a PUC order should not preclude the PUC from considering allegations of misconduct as in *Limelight Limousine,* particularly where there is no evidence that the violations were inadvertent or based on a misunderstanding of the law. Indeed, Lehigh contends this is precisely the type of misconduct the PUC warned about in *Re Lemanowicz,* 70 Pa.P.U.C. 278 (1989), in which the PUC stated:

> The granting of authority to someone who the [PUC] believed was lacking a propensity to operate legally would pose different threats. Primarily, of course, such a grant would tend to undermine regulatory structure. Lawful operators, seeing that unlawful operation had no effect on the granting of authority to operate, could well be tempted to [engage] in unlawful activities of their own. Without the deterrent effect of operators' knowledge that illegal activity could lead to a finding of lack of fitness which would preclude the granting of new authority, the regulations governing grants of authority could become virtually meaningless.

*Id.* at 296 (emphasis omitted).

However, unlike in *Limelight Limousine,* the PUC did consider the testimony presented and, for reasons it explained, did not give significant weight to Lehigh's allegations. The PUC did not give much weight to the alleged tariff violations because J & J's witnesses only merely be-

lieved or thought they were charged a flat rate. Similarly, Lehigh's General Manager and consultant testified regarding alleged solicitations from J & J drivers and, for specified reasons, the PUC did not find that any violation occurred. Likewise, the PUC considered the internet advertisements and concluded that, while unclear, the lack of clarity did not establish that J & J had disregarded the legal requirements. The PUC also considered the two complaints, one of which had been dismissed by the PUC and the other settled with the understanding that it would have no impact on future determinations of J & J's fitness. The PUC also considered Ms. Cali's credited testimony that J & J was unaware of Lehigh's allegations, would investigate, and would discipline any driver violating the law. In essence, Lehigh is asking this Court to reweigh the evidence, find that violations of J & J's tariffs and certificate occurred, and come to a different conclusion than the fact finder, which is clearly beyond the power of this Court. *Popowsky*, 550 Pa. at 462, 706 A.2d at 1203. The PUC considered the factors, which include J & J's 25 years of experience, the testimony, and the evidence and concluded that uncredited allegations of isolated incidents of misconduct were not sufficient to establish that J & J lacked the propensity to operate legally and safely. We cannot find that the PUC erred in reaching that conclusion.[7]

Accordingly, the PUC's Order is affirmed.

### ORDER

NOW, October 10, 2012, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby **AFFIRMED.**

---

7. We note that, even if there was merit to the allegations of prior unlawful conduct, such conduct does not, per se, preclude the PUC from granting the Application where the conduct was not pervasive and, given Ms. Cali's testimony that J & J would investigate and correct the errors on its website, such conduct was unlikely to occur in the future. *Loma, Inc. v. Pennsylvania Public Utility Commission*, 682 A.2d 424, 431 (Pa.Cmwlth.1996) (holding that the PUC did not err in granting a certificate of public convenience where the unauthorized activities were the result of a misunderstanding of the scope of the applicant's existing authority, the irregularities were not pervasive, and that, due to a change in the applicant's business, it was unlikely that any irregularities would occur in the future); *Gettysburg Tours, Inc. v. Pennsylvania Public Utility Commission*, 42 Pa.Cmwlth. 399, 400 A.2d 945, 949 (1979) (applicant's illegal rendition of services did not preclude granting of certificate of public convenience where the PUC's decision was otherwise supported by substantial evidence). As in *Gettysburg Tours*, "[s]ince the PUC's determination in the instant case [i]n no way relies on evidence of illegal or unauthorized rendition of service, but rather is buttressed by ample evidence relating to admittedly legal and authorized rendition of service, we have no difficulty" in affirming the PUC's determination. *Gettysburg Tours*, 400 A.2d at 949 (footnote omitted).