MAPEMAWA, INC., Petitioner

v.

PHILADELPHIA PARKING
AUTHORITY, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 23, 2012.

Decided Jan. 24, 2013.

Michael S. Henry, Philadelphia, for petitioner.

Carl R. Shultz, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and COLINS, Senior Judge.

OPINION BY Judge LEAVITT.

Mapemawa, Inc. (Applicant) petitions for review of an adjudication of the Philadelphia Parking Authority, Taxicab and Limousine Division (Parking Authority) denying its application for a certificate of public convenience to provide limousine service in Philadelphia. The Parking Authority did so for the stated reason that Applicant did not show that it was capable of providing lawful service because it had "pled liable" to a Parking Authority citation in 2008 and paid a civil penalty of $1,000. Concluding that the single 2008 enforcement action is insufficient to support the Parking Author-

ity's conclusion that Applicant lacked the propensity to operate legally, we reverse.

We begin with a review of the applicable regulatory scheme. The Pennsylvania Public Utility Commission (PUC) licenses limousines and taxicabs that operate in all parts of Pennsylvania, save the City of Philadelphia. There, under Chapter 57 of the act commonly referred to as the Parking Authority Law (Law), 53 Pa.C.S. §§ 5701–5745, the Parking Authority licenses and regulates limousines.[1] To operate in Philadelphia, a limousine company must obtain a certificate of public convenience from the Parking Authority, which may grant a certificate if it determines, *inter alia*, that the "applicant is capable of providing ... lawful ... service." 53 Pa. C.S. § 5741(a).[2] The PUC's regulation explains that it may withhold a certificate where the "applicant lacks a propensity to operate safely and legally." 52 Pa.Code § 41.14(b). The Parking Authority uses the PUC's regulation as its own.[3]

In April 2009, Applicant[4] applied to the PUC for a certificate of public convenience to provide limousine service in Pennsylvania and to the Parking Authority to provide limousine service in Philadelphia. In October of 2009, the PUC granted Applicant a certificate of public convenience. However, in January 2010 the Parking Authority denied Applicant a certificate when its Enforcement Department objected for the stated reason that Applicant had pleaded liable to one citation issued by the Parking Authority. The Parking Authority denied Applicant a certificate under authority of its 2005 regulation, which was later nullified by this Court because it had not been adopted in accordance with the terms of the Commonwealth Documents Law.[5] *Germantown Cab Co.*, 993 A.2d at 934. Applicant appealed, and a Parking

---

1. For many years, the PUC regulated all limousine and taxicab operations in Pennsylvania. In 2004, the General Assembly passed the Act of July 16, 2004, P.L. 758, No. 94 (*as amended* 53 Pa.C.S. §§ 5701–5745), giving the Parking Authority the duty to regulate limousine and taxicab service in Philadelphia.

2. Section 5741(a) of the Law states, in relevant part, as follows:

 In order to operate a limousine service within a city of the first class, the limousine service must have a certificate of public convenience issued by the authority under section 5741.1 (relating to power of authority). The authority may grant a certificate of public convenience to provide limousine service *if the authority determines that the applicant is capable of providing safe, adequate, lawful and dependable service to the public.*

 53 Pa.C.S. § 5741(a) (emphasis added).

3. The full text of the regulation appears *infra*. In June 2005, the Parking Authority established its own limousine and taxicab regulation. However, that regulation was ruled invalid and unenforceable. *Germantown Cab Co. v. Philadelphia Parking Authority*, 993

A.2d 933 (Pa.Cmwlth.2010), *affirmed,* —— Pa. ——, 36 A.3d 105 (2012). This Court suggested that the Parking Authority could use the PUC's regulations until it had an opportunity to properly promulgate its own regulation, lest Philadelphia be left with a regulatory void. In this case, the Parking Authority applied the PUC's regulation and Applicant agrees that it is the proper regulation to use. Because the Parking Authority's former regulation and the PUC's regulation are substantially similar, the outcome would have been the same under either regulation.

4. Applicant has operated under two different corporate names. In early 2008, Applicant was established as a Pennsylvania corporation under the name "PHL Ground Transportation Services, Inc." In February 2009, Applicant changed its corporate name to "Mapemawa, Inc."

5. Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602, and 45 Pa.C.S. §§ 501–907, which, collectively, are known as the "Commonwealth Documents Law." This was the official short title of the 1968 enactment. *See* Section 101 of the Act of July 31, 1968, P.L. 769.

Authority hearing officer conducted a *de novo* hearing on August 11, 2010.

Maria Fernandez, the owner and president of Applicant, testified, beginning with a description of her experience in the limousine and taxicab industry. She began driving a taxicab in Philadelphia in 1997 and started her own Philadelphia taxi dispatch company in 2002. When the Parking Authority took over taxicab regulation in 2005, Fernandez sought and obtained a Parking Authority certificate for her dispatch business. In 2008, Fernandez incorporated Applicant, then called "PHL Ground Transportation, Inc." In February of 2008, Applicant entered into a lease with Limo 2000, a limousine company with certificates of public convenience from the PUC and from the Parking Authority. The lease gave Applicant the right to operate one of Limo 2000's vehicles in exchange for a flat weekly payment of $550. Fernandez' husband, Walter Fernandez, booked the trips and did the driving.

In April of 2008, Fernandez set up a website that described Applicant as "a full Philadelphia limo service and transportation service company in Philadelphia." Reproduced Record at 49, 122 (R.R. ____). Noting that "PHL" was the designation for Philadelphia International Airport, Fernandez explained that the website was not intended to target the city itself but, rather, the Philadelphia area. With respect to the website's description of Applicant as licensed by the PUC and the Parking Authority, Fernandez explained that she believed the statement was true by reason of Applicant's lease with Limo 2000, which did hold certificates of public convenience from the PUC and from the

Parking Authority. Fernandez stated that she had included a paragraph on the website explaining that Applicant was operating under a lease with Limo 2000, but that paragraph was not on the printout of the website presented to her at the hearing. The two telephone numbers listed on Applicant's website were her husband's cell phone numbers, not Limo 2000's phone number. Fernandez acknowledged that Applicant charged passengers for trips using Applicant's credit card account, not that of Limo 2000.

In August of 2008, the Parking Authority informed Fernandez that Applicant's website was improper, and she immediately took it down. In addition, Applicant stopped its limousine operations in Philadelphia.

Fernandez testified about a 2008 citation issued to Applicant under authority of the Parking Authority's 2005 regulation. The Parking Authority's citation alleged that "on two separate occasions, 8/15 and 8/19, [Applicant] booked passenger trips involving point-to-point service in Philadelphia. The above company is not registered with the [Parking Authority] or the PUC." R.R. 55. The parties settled the Parking Authority's enforcement action. Applicant pleaded "liable" to the citation and paid a civil penalty of $1,000. For its part, the Parking Authority withdrew three other citations it had filed that related to the same conduct.[6]

Walter Fernandez also testified. He stated that he began driving a taxicab in 1987 and that he and his wife founded a taxicab company in 2002. When the Parking Authority assumed responsibility for regulating taxicabs and limousines in 2005,

---

6. On April 29, 2009, the parties settled the Parking Authority's citations, filed on January 29, 2009. R.R. 135. The terms of the settlement were memorialized in a brief hearing before a Parking Authority hearing officer.

The citations refer to the regulation that was later nullified and replaced. Because the Parking Authority's regulation is gone, it is impossible to reconstruct the substance of the citations.

Walter Fernandez studied its regulations. He succeeded in getting their taxicab company licensed by the Parking Authority. After they sold the taxicab company, they decided to enter the limousine business.

Walter Fernandez confirmed that Applicant began operations by leasing a limousine from Limo 2000, which directed very little business to Applicant, at most 10 percent of the 25 to 30 trips it made each week. Two to three trips a week would not cover Applicant's lease obligation of $550 per week. To drum up additional business, Applicant put up the website in April 2008. Walter Fernandez confirmed that the receipt he gave passengers said "PHL." This was done because if passengers had paid Limo 2000, then Applicant would have been forced to collect from Limo 2000 and suffer delays in obtaining the cash flow necessary for its operational expenses.

Walter Fernandez testified that he believed Applicant operated lawfully because it had leased the right to use Limo 2000's certificates of public convenience. However, when the Parking Authority complained in August of 2008, Applicant took down the website and stopped doing business in Philadelphia.

The Parking Authority presented the testimony of John Broggi, an inspector with the Parking Authority's Taxicab and Limousine Division. He explained that a complaint from a Fernandez competitor and former business associate prompted Broggi's investigation of Applicant. After Broggi found Applicant's website, he set up a sting operation in August of 2008. A Parking Authority employee called Applicant to arrange limousine service to the airport from two city hotels. Broggi watched Walter Fernandez arrive at one hotel, pick up passengers and take them to

the airport. He arrived a second time but left without picking up passengers; Broggi believed this was because Fernandez had spotted him.

Broggi then testified about Applicant's website. Asserting that only a licensed company can deal directly with customers, Broggi claimed that Applicant's business had to come from Limo 2000. If a customer contacted Applicant for limousine service, Applicant had to notify Limo 2000 and obtain its prior approval before providing the service. Broggi expressed concern that passengers would not know that they were dealing with Limo 2000, and this would impede their ability to pursue a complaint with the Parking Authority should the need arise.

 On March 1, 2011, the hearing officer issued his adjudication. He explained that because the regulation cited by the Parking Authority had been set aside by this Court, he would cite, instead, to the PUC regulation. The hearing officer found that it was "impossible to accept that [Applicant's] unlawful operations resulted from a good faith misunderstanding of the law." Parking Authority Adjudication at 5, 8. However, the hearing officer did not explain why Applicant's understanding of the law was wrong. He did not analyze why Applicant could not operate lawfully under its lease of Limo 2000's certificate of public convenience. The hearing officer concluded that Applicant "flagrantly and defiantly" offered a limousine service in Philadelphia without a certificate of public convenience, which showed a "lack of a propensity to operate legally." *Id.* at 8. Accordingly, he withheld the requested certificate of public convenience under authority of 52 Pa.Code § 41.14(b). Applicant now petitions for this Court's review.[7]

7. The Authority functions as a Commonwealth agency in matters involving limousines

Applicant argues that the Parking Authority erred for two reasons. First, Applicant argues that the evidence is inadequate to support the conclusion that Applicant lacks a propensity to operate legally. Second, Applicant contends that the Parking Authority erred because the 2008 enforcement action that caused the Parking Authority to deny Applicant a certificate of public convenience in January 2010 was, itself, illegal in that it was based upon a regulation later determined to be a nullity. This should have been considered by the hearing officer in rendering his adjudication in March of 2011.

The regulation at 52 Pa.Code § 41.14(b), on which the hearing officer relied, authorizes the withholding of a certificate of public convenience from an applicant that "lacks a propensity to operate safely and legally." It states as follows:

(b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service. In addition, *authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally.* In evaluating whether a motor carrier applicant can satisfy these fitness standards, *the Commission will ordinarily examine the following factors,* when applicable:

(1) Whether an applicant has sufficient capital, equipment, facilities and other resources necessary to serve the territory requested.

(2) Whether an applicant and its employees have sufficient technical expertise and experience to serve the territory requested.

(3) Whether an applicant has or is able to secure sufficient and continuous insurance coverage for all vehicles to be used or useful in the provision of service to the public.

(4) Whether the applicant has an appropriate plan to comply with the Commission's driver and vehicle safety regulations and service standards contained in Chapter 29 (relating to motor carriers of passengers).

(5) *An applicant's record, if any, of compliance with 66 Pa.C.S.' (relating to the Public Utility Code), this title and the Commission's orders.*

(6) Whether an applicant or its drivers have been convicted of a felony or crime of moral turpitude and remains subject to supervision by a court or correctional institution.

52 Pa.Code § 41.14(b) (emphasis added).[8] In determining that Applicant lacked a propensity to operate legally, the hearing examiner purported to consider Applicant's "record . . . of compliance" with Public Utility Code and Commission orders. 52 Pa.Code § 41.14(b)(5).

---

and taxicabs. *Blount v. Philadelphia Parking Authority,* 600 Pa. 277, 289, 965 A.2d 226, 234 (2009). Our review of a Commonwealth agency adjudication is limited to determining whether constitutional rights were violated, agency procedures were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Sule v. Philadelphia Parking Authority,* 26 A.3d 1240, 1242 n. 4 (Pa.Cmwlth. 2011). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Mrs.*

*Smith's Frozen Foods Company v. Workmen's Compensation Appeal Board (Clouser),* 114 Pa. Cmwlth. 382, 539 A.2d 11, 14 (1988).

8. Notably, all precedent involving this regulation derives from third-party complaints requesting the PUC deny an applicant a certificate of public convenience or expanded service area. Stated otherwise, the regulation is invoked by competitors to limit entry to the marketplace.

Applicant has little history with the PUC to examine because it was licensed only in October of 2009. Nevertheless, the Parking Authority's Enforcement Department presented *no evidence* at the hearing that Applicant had encountered any enforcement issues with the PUC. Applicant's principals, Walter and Maria Fernandez, are each licensed by the PUC and the Parking Authority as drivers, and they owned a taxicab and dispatch company.[9] Neither they nor their companies, with the exception of Applicant, have been cited by the PUC, the Parking Authority, the Interstate Commerce Commission or the Federal Motor Carrier Safety Administration. R.R. 40, 45–46. Neither has Applicant, with the exception of the 2008 citation. *Id.*

Applicant argues that there is *no* evidence that Applicant lacked a propensity to operate legally. Applicant points out that when the Parking Authority informed Applicant that its website was improper, Applicant immediately shut down the website; stopped doing limousine business in Philadelphia; and applied for its own certificate of public convenience from the Parking Authority. It settled the Parking Authority's citation and paid a civil penalty. This conduct shows commitment to conform to the Parking Authority's view of what the law requires, not a propensity to violate the law.

The Parking Authority responds that the hearing officer rejected the Fernandez's explanations for their actions. Accordingly, Applicant's conduct in 2008 was the kind of serious violation that bars it from obtaining a certificate of public convenience.

This Court recently considered the meaning of the phrase "lacks a propensity to operate safely and legally" as it appears in 52 Pa.Code § 41.14(b). We held that it means that an applicant must demonstrate

> a persistent disregard for, flouting or defiant attitude [toward the law or agency orders] before that applicant is considered to have a propensity, *i.e.*, a natural inclination or innate or inherent tendency, to operate outside of safety and the law.

*Lehigh Valley Transportation Services, Inc. v. Pennsylvania Public Utility Commission*, 56 A.3d 49, 58 (Pa.Cmwlth.2012) (internal quotation and citation omitted) (emphasis added). We held that an *"inadvertent or isolated violation"* of the law does not disqualify an applicant from receiving a certificate of public convenience because a single violation "does not demonstrate that [the applicant] is naturally inclined or has an innate tendency to operate unsafely or illegally." *Id.* (emphasis added).

The holding in *Lehigh Valley* is consistent with precedent establishing that a prior history of violations does not automatically disqualify an applicant from receiving a certificate of public convenience. *Loma, Inc. v. Pennsylvania Public Utility Commission*, 682 A.2d 424, 431 (Pa.Cmwlth. 1996). Accordingly, where an applicant has acted unlawfully because of a misunderstanding of the law, the PUC will refuse a competitor's request that a license not be granted. *Id.* (citing *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission*, 137 Pa.Cmwlth. 282, 585 A.2d 1151, 1154–55 (1991)). On the other hand, where the applicant's prior history demonstrates "a deliberate disregard of ... the law, then, of course, the wrongdoer should not profit from his own deliberate wrong." *Bunting Bristol Transfer, Inc. v. Pennsylvania Public*

---

9. Arguably, it is relevant to consider the enforcement history of Applicant's principals because Applicant is a new entrant to the marketplace.

*Utility Commission,* 418 Pa. 286, 291, 210 A.2d 281, 283 (1965) (quoting *Lancaster Transportation Co. v. Pennsylvania Public Utility Commission,* 181 Pa.Super. 129, 124 A.2d 380, 385 (1956)).

■ In this case, we would reverse based on the simple fact that the Parking Authority denied Applicant's application for a certificate of public convenience on the sole basis of a nullified regulation. For reasons mysterious to the Court, the Parking Authority never cited the statutory standard for licensure, *i.e.,* that an applicant show it is "capable of providing lawful service." 53 Pa.C.S. § 5741(a). The Parking Authority cited only its regulation that has been nullified because it was not promulgated in accordance with the Commonwealth Documents Law.

We will, however, address the merits, which is whether the circumstances of the citation settled by the Parking Authority and Applicant provided sufficient grounds to deny Applicant a certificate of public convenience. We hold that it did not.

First, the evidence did not show that Applicant acted in deliberate violation of the law. Broggi opined that Applicant was required to get Limo 2000's approval of each ride, but he offered no authority for that view. The PUC regulation allows a holder of a certificate of public convenience to lease its vehicles to "driver-lessees." 52 Pa.Code § 29.101(f)(2).[10] The regulation requires daily log sheets, but it says nothing about the driver-lessee needing approval from the lessor for each ride. Indeed, the Parking Authority has not explained to the Court why Applicant's understanding of its use of Limo 2000's licenses was erroneous or did not conform to the licensing requirements of either the statute or regulation.

Second, if Applicant had set out to violate the law, it would not have (1) entered into a lease with Limo 2000 and (2) publicized its illegal conduct on the internet. Our precedent teaches that this type of evidence supports Applicant's position that it did not deliberately set out to violate the Parking Authority's regulation. In *B.B. Motor Carriers, Inc. v. Pennsylvania Public Utility Commission,* 36 Pa.Cmwlth. 26, 389 A.2d 210 (1978), a carrier ran an unauthorized hauling operation for nine years. As was the case here, the carrier operated under a lease with another carrier, which it believed to be a lawful way to operate. We held that notwithstanding its nine-year history of unlicensed activity, the carrier was entitled to a certificate of public convenience.

Third, Applicant's single citation did not prove a "propensity" to violate the law, *i.e.,* a "persistent disregard for, flouting or defiant attitude." *Lehigh Valley Transportation,* 56 A.3d at 58. In *In re Gettysburg Tours, Inc. v. Pennsylvania Public Utility Commission,* 42 Pa.Cmwlth. 399, 400 A.2d 945 (1979), we held that five citations, for

---

**10.** It states:

> (2) The holder of a call or demand certificate may lease vehicles to drivers for operation in the service of the certificate holder only under the following conditions:
> (i) The leased vehicle shall be operated under the direct control and supervision of the certificateholder.
> (ii) The driver-lessee of the vehicle and the certificateholder shall be required to keep and retain daily log sheets as pre-

> scribed by § 29.313(c) (relating to service standards and requirements).
> (iii) The certificateholder shall be required to furnish and maintain adequate service to the public which shall be reasonably continuous and without unreasonable interruptions or delays.
> (iv) The leasing plan of the certificateholder must conform with § 29.315 (relating to alternative forms of compensation).
>
> 52 Pa.Code § 29.101(f)(2).

which the certificateholder had settled with the payment of civil penalties, did not demonstrate a propensity to operate illegally and, thus, bar an expansion of its service area. Here, Applicant settled the matter of its violation of a regulation, later nullified, and so did the Parking Authority. The settlement, binding on both parties, resolved the matter of Applicant's conduct between April and August 2008. If the Parking Authority believed that Applicant's violation of law was so serious, as it now contends, then it should not have settled the citation for $1,000. It should have exacted an agreement from Applicant that it would not be eligible for a certificate of public convenience or gone to a hearing. It did not do so.

Fourth, Applicant immediately yielded to the Parking Authority's complaint and changed its conduct. Precedent from another state construing a statutory standard of "propensity" similar to the PUC's regulation is instructive. In *A Touch of Class Limousine, Inc. v. Old Market Limousine Service, Inc.*, 243 Neb. 33, 497 N.W.2d 71 (1993), an unlicensed limousine company received three warnings from the Public Service Commission that it needed a license in order to operate lawfully. The warnings were ignored. The Nebraska Supreme Court held that the continued refusal to obtain a license demonstrated a propensity to operate illegally. Here, by contrast, Applicant responded to the Parking Authority's complaint by taking down its website and yielding to the Parking Authority's view of the law.

The record does not demonstrate a "persistent disregard for, flouting or defiant attitude." *Lehigh Valley Transportation*, 56 A.3d at 58. Here, the citation was based solely on a regulation, later nullified, and the evidence shows that Applicant took immediate measures to respond to the Parking Authority's concerns. Notably, the PUC has licensed Applicant to operate everywhere in Pennsylvania, save Philadelphia, which is now beyond the PUC's jurisdiction.

For these reasons, we reverse the Parking Authority.

## ORDER

AND NOW, this 24th day of January, 2013, the order of the Philadelphia Parking Authority dated March 1, 2011, in the above captioned matter is hereby REVERSED.