Brink's Incorporated, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.
Brooks Armored Car Service, Inc., Intervenor.

Argued September 8, 1980, before Judges Wilkinson, Jr., Rogers and Craig, sitting as a panel of three.

454

*Herbert R. Nurick, McNees, Wallace & Nurick,* for petitioner.

*Eric A. Rohrbaugh,* Assistant Counsel, with him *Alfred N. Lowenstein,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

*William M. Barnes,* with him *George P. Williams, III, Schnader, Harrison, Segal & Lewis,* for intervenor.

OPINION BY JUDGE WILKINSON, JR., November 6, 1980:

The petitioner would have this Court reverse the order of respondent, Public Utility Commission (Commission) granting intervenor (Brooks) certain motor carrier operating authority as a contract carrier on the grounds that Brooks did not establish its fitness.[1] We agree and reverse.

Brooks has what it calls an affiliate (WFB) which has contract carrier rights in Philadelphia; WFB is wholly owned by William F. Brooks, Sr., who also owns 85% of the shares of Brooks. The officers and directors of Brooks and WFB are the same or sub-

---

[1] Petitioner raised a second question as to the power of the Commission to grant Brooks greater rights than had been included in the application. We need not and do not reach that issue.

stantially the same. The Commission expressly does not take the position that Brooks and WFB "were not closely interconnected corporations." Indeed, in our opinion, the actions of one with regard to fitness certainly would apply to the other. It is the position of Brooks and the Commission that all actions of each were in good faith and did not reflect adversely on the question of Brooks' fitness.

Petitioner has offered evidence to show that both Brooks and WFB have so knowingly and willfully performed illegal services and otherwise violated their authority under their existing intrastate and interstate rights as to render Brooks unfit to be granted the additional intrastate rights in issue here. On all but one of these alleged violations the matter of good faith is contested and, as to them, we are bound by the Commission's findings. However, there is other action of WFB and, under the circumstance outlined above we treat as actions of Brooks, that so clearly establish Brooks unfitness as to require us to hold that the Commission abused its discretion in finding Brooks fit.

The action to which we refer is continuing to operate on the basis that its authority to haul property included the right to haul money after this Court had ruled otherwise. This question was argued twice before this Court—once before a panel and once before the Court en banc. By a divided Court, 4-2, we held in an opinion filed October 17, 1977 that there was no authority to deliver money. Nevertheless, although no supersedeas was obtained and the Supreme Court of Pennsylvania refused the requests for an allowance of appeal on March 1, 1978, WFB continued to haul money until the Commission entered a cease and desist order on April 13, 1978. Delivery of money was immediately taken over by Brooks.

At oral argument counsel for intervenor attempted to accept responsibility and blame for this completely

and obviously unacceptable refusal to abide by this Court's ruling on the theory that he should have advised his client to stop delivering money. Of course, he agrees he had advised his client of this Court's order and the Supreme Court of Pennsylvania's order.

It seems almost frivolous to argue that a corporation is fit to hold enlarged rights approved by this Court when it attempts to justify violating our previous rulings concerning the extent of its authority by arguing that although notified of our ruling its lawyer failed to say it was bound by it! Even after the order of the Supreme Court of Pennsylvania entered March 1, 1978 it continued to operate beyond its authority until ordered to cease by the Commission on April 13, 1978. The parties do not contest, nor could they, that the burden was on Brooks to establish its fitness. *See* Section 2503(b), Public Utility Code, 66 Pa. C. S. §2503(b); *Wiley v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 309, 142 A.2d 763 (1958).

Brooks argues that since it was granted other additional authority by the Commission in an unrelated proceeding on April 27, 1978 it must have been determined that it was fit at that time and all the above improper activities occurred prior to that date. Suffice it to say that that grant of authority was not appealed to this Court.

Accordingly, we will enter the following

ORDER

AND Now, November 6, 1980, the order of the Pennsylvania Public Utility Commission in Application Docket No. 96633, F.2, adopted May 31, 1979, and entered July 2, 1979, is reversed.

---

DISSENTING OPINION BY JUDGE CRAIG:

I must respectfully dissent from the majority decision, which may in effect bar Brooks indefinitely

from any further contract motor carrier permit in its field, solely because Brooks' affiliate WFB continued to haul money contrary to our October 17, 1977 decision in *Purolator Security, Inc. v. Pennsylvania Public Utility Commission*, 32 Pa. Commonwealth Ct. 175, 378 A.2d 1020 (1977), until the commission issued a cease order in April, 1978.

Review of the whole pattern of the judicial decisions on this type of case indicates that we are not warranted in reversing the Commission.

At the outset, it must be granted that, after the date of our decision in *Purolator, supra,* Brooks could have no bona fide misunderstanding as to the legal status of the operations involved, notwithstanding the petitions for allocatur filed by WFB and the Commission or the absence of a Commission cease order until the following April.

Accordingly, at the least it is certain that evidence of WFB's service from October 17, 1977 to April, 1978, could not serve as any part of a basis for a favorable determination of fitness in this case. The law is clear that evidence of deliberate illegal operations by itself cannot support findings of an applicant's fitness or the necessity of a proposed service. In *Bunting Bristol Transfer, Inc. v. Pennsylvania Public Utility Commission*, 418 Pa. 286, 292, 210 A.2d 281, 284 (1965), the Supreme Court continued the rule of "D. F. Bast, Inc. v. Pennsylvania Public Utility Commission, 397 Pa. 246, 251, 154 A.2d 505, 508, . . . that evidence of illegal operations . . . is 'improper for consideration by the Commission' ", referring to the use of such evidence in support of the wrongdoer's position.

However, *Bunting* also continued the doctrine of "Lancaster Transportation Co. v. Pennsylvania Public Utility Commission, 181 Pa. Superior Ct. 129, 138, 124 A.2d 380, 385 [where] President Judge Rhodes stated: 'The mere fact of prior operation without commission

approval is not per se equivalent to an offense which will prohibit absolutely the acquisition of proper authority when the application is subsequently made.' '' *Bunting, supra,* at 290, 210 A.2d at 283.

The majority here holds in effect that the illegal activities of Brooks' affiliate categorically preclude the Commission from finding Brooks fit. As Judge ROGERS wrote in *Johnstown-Pittsburgh Express v. Pennsylvania Public Utility Commission,* 5 Pa. Commonwealth Ct. 521, 527, 291 A.2d 545, 548 (1972), "[t]his is much too broadly stated. The cases . . . hold only that movements made in wilful violation of authority may not be considered by the Commission as evidence. [Citing Bunting, supra, and D. F. Bast, supra.]'' Thus, past violations, although relevant to an applicant's fitness, are simply evidence to be weighed by the Commission and are not dispositive.[1]

These principles have, even recently, been continued and applied by this court. *Gettysburg Tours, Inc. v. Pennsylvania Public Utility Commission,* 42 Pa. Commonwealth Ct. 399, 400 A.2d 945 (1979); *B. B. Motor Carriers, Inc. v. Pennsylvania Public Utility Commission,* 36 Pa. Commonwealth Ct. 26, 389 A.2d 210 (1978).

Under these principles, none of WFB's activities after our decision in *Purolator* necessitates a conclusion that Brooks is unfit; even in view of those activities, the Commission can properly find Brooks fit

---

[1] Brink's argues that *Bunting* requires an applicant to overcome a presumption of bad faith in illegal activities, and to support a finding of good faith, as threshold conditions to a finding of fitness. That is not the law. Such "presumption" of bad faith as exists (*see Johnstown-Pittsburgh, supra*), is a threshold condition only of the admissibility of evidence derived from illegal operations. It is not a presumption of unfitness, and it does not make the established burden of an applicant to demonstrate its fitness more legally demanding. A finding of fitness need only be supported by substantial evidence as that standard has been articulated in case law.

if there exists substantial evidence to support that con-
clusion aside from evidence derived from the unau-
thorized activities. *Gettysburg Tours, supra.*

With respect to such positive evidence of fitness,
we are faced with a situation very similar to that in
*Lancaster, supra.* There, the Superior Court reviewed
the Commission's grant of two carriers' applications
to establish an interchange at a point common to their
respective certificated areas. The two carriers had
commenced the interchange in 1949; in July 1951, the
Superior Court held that the interchange was unlaw-
ful, but the two carriers continued the interchange
until the Commission's cease order of October 20,
1952.

In the interim between the Superior Court's order
and the order of the Commission, the two carriers ap-
plied for authority to conduct the interchange, which
was granted by the Commission in 1955. Protesting
carriers appealed.

The Superior Court agreed that evidence derived
from the two carriers' activities after the court's July
1951 order should not have been admitted nor made
the basis of the Commission's order. The court con-
tinued, however, that "[u]nfortunately, on the record
before us there is no separation of the evidence . . .
[between] the respective periods." *Lancaster, supra,*
at 139, 124 A.2d at 385. The court affirmed the Com-
mission's grant because it could not "make any dis-
tinction between the periods from the evidence, and,
secondly, because the service of [the two carriers] was
consistently good." *Lancaster, supra,* at 139-40, 124
A.2d at 385.

Here, as in Lancaster, the record does not facilitate
a precise demarcation of evidence between the two
periods of WFB's operation; the banks which utilized
WFB did so from the time WFB acquired its property
certificate in 1974, and continued to do so after our de-

cision in *Purolator,* until Brooks supplanted WFB's intrastate operations by its interstate service. Since that time they have used Brooks.

Without distinguishing periods of time, the supporting banks alternatively categorized the service by Brooks and WFB as very good, fine, top-notch, excellant, or high quality. The Federal Reserve Bank witness testified that it had used Brooks' interstate service since 1975, describing that service as very good.

Therefore, although WFB's continued operation after our *Purolator* decision certainly presented a negative mark against WFB, the Commission's determination of fitness does not lack substantial support in the record. The conflict between the evidence of Brooks' authorized services taken together with evidence relating to WFB's service before our *Purolator* decision, versus the negative evidence of unauthorized activities, was a conflict properly within the province of the Commission.

Accordingly, our scope of review limits our power to reverse the determination of fitness.

Our review here is limited to a determination of whether constitutional rights have been violated, an error of law committed, or if there is a lack of substantial evidence. "We may not conceive an independent judgment and substitute it for the judgment of the Commission and . . . we may not indulge in the process of weighing evidence and resolve conflicting testimony." *Johnstown-Pittsburgh Express, Inc., supra,* at 525, 291 A.2d at 547.

The remaining contention is that the Commission exceeded its statutory authority by including in its grant of authority the counties of Blair, Bradford, Cameron, and Pike. Admittedly, these four counties were not enumerated in the original application, the "Service of Notice of Motor Carrier Application", nor

in the notice of application published in the Pennsylvania Bulletin.

The 48 counties enumerated in the Commission's order comprise the Pennsylvania portion of the Third Federal Reserve District. The initial order of the administrative law judge enumerated only the 44 counties named in Brooks' application.

Brooks filed an exception to that order requesting the inclusion of the four counties named above; the Commission granted that request "for the reason that these counties lie east of the Counties of McKean, Elk, Clearfield, Cambria and Bedford which comprise the westerly boundary of the area included within the Third Federal Reserve District—the area for which [Brooks] . . . seeks authorization to serve, as established by the evidence."

Brink's contends that the Commission erred because 66 Pa. C. S. §2503 provides that the Commission may authorize "in whole or in part the service covered by the application." It asserts that the inclusion of these counties was beyond the Commission's authority because they were absent from the enumeration in the application, and thus due process was violated in that no notice was given that the permission was sought for the four counties.

The Commission urges that the quoted language of 66 Pa. C. S. §2503 should not be so narrowly interpreted as to preclude the addition of the four counties, because all the parties were aware that Brooks sought to serve the whole of the Third Federal Reserve District and because the record clearly shows that such was Brooks' intent. Further, the Commission notes that Brink's was sufficiently apprised of the area contemplated in the proceedings and was in no way deprived of opportunity to contest the application.

Although one cannot approve of the process of seeking such changes by exception to the order rather

than by proposing amendment of the application, the record is clear that the area contemplated was the entire Third Federal Reserve District, that the parties were aware of that fact, and that Brink's has claimed no prejudice as a consequence of the discrepancy.

Accordingly, it is submitted that the Commission should be affirmed.