**ROSEMONT TAXICAB CO., INC., Petitioner**

v.

**PHILADELPHIA PARKING AUTHORITY, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 17, 2012.

Decided May 22, 2013.

Reconsideration Denied July 12, 2013.

Michael S. Henry, Philadelphia, for petitioner.

Carl R. Shultz, Philadelphia, for respondent.

BEFORE: PELLEGRINI, President Judge, LEAVITT, Judge and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.[1]

Rosemont Taxicab Co., Inc. (Rosemont) petitions for review of an adjudication of the Philadelphia Parking Authority, Taxicab and Limousine Division (Parking Authority) denying its request to acquire the license of Concord Coach USA t/a Bennett Taxicab (Bennett Taxicab) to provide taxicab service in a part of Philadelphia. The Parking Authority denied Rosemont's application for the stated reason that it lacked (1) sufficient technical expertise and (2) a commitment to provide safe and lawful taxicab service. The Public Utility Commission reached the opposite conclusion. Accordingly, it approved Rosemont's application to acquire Bennett's license to provide taxicab service outside Philadel-

---

1. The case was reassigned to this author on   November 9, 2012.

phia. For over three years, Rosemont has been operating under its Commission-issued certificate of public convenience. Concluding that the evidence is insufficient to support the Parking Authority's conclusion, we reverse.

Central to the Public Utility Commission's regulation of public utilities is a certificate of public convenience, which every utility must acquire before it can operate lawfully. *See* 66 Pa.C.S. § 1101 (public utility may supply service where a certificate of public convenience is "first had and obtained.") The Commission will grant a certificate of public convenience where "necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). An existing certificate of public convenience can be transferred to a new holder "[u]pon the approval of such application by the [C]ommission." 66 Pa.C.S. § 1102(a)(3); *South Hills Movers, Inc. v. Pennsylvania Public Utility Commission,* 144 Pa.Cmwlth. 505, 601 A.2d 1308, 1309 (1992). The applicant for a transfer must satisfy the standards in Section 1103(a) of the Public Utility Code, and in the Commission's regulation, by demonstrating the technical expertise to provide the utility service and a commitment to provide that service in a safe and lawful manner. 52 Pa.Code § 41.14; *Lehigh Valley Transportation Services, Inc. v. Pennsylvania Public Utility Commission,* 56 A.3d 49, 55 (Pa.Cmwlth.2012).*

In 2004, the General Assembly transferred the responsibility for regulating limousine and taxicab service in Philadelphia from the Commission to the Parking Authority. *See* Act of July 16, 2004, P.L. 758, No. 94 (Act 94). The Parking Authority's authority with respect to this new regulatory regime is set forth in Chapter 57 of the act commonly referred to as the Parking Authority Law, *as amended,* 53 Pa. C.S. §§ 5701–5745. Otherwise, the Public Utility Commission remains responsible for regulating limousine and taxicab service in Pennsylvania. As does the Public Utility Code, the Parking Authority Law requires the approval of the Parking Authority before one of its certificates of public convenience can transfer from one taxicab company to another. 53 Pa.C.S. § 5711(c)(5).[2]

Bennett Taxicab has operated for many years under a certificate of public convenience issued by the Public Utility Commission. This certificate authorizes it to operate in Delaware and Montgomery counties as well as a small part of the City of Philadelphia. Because of its small service area in Philadelphia, Bennett Taxicab is known as a partial rights taxicab company.[3] This means that Bennett Taxicab can

---

**2.** Section 5711(c)(5) of the Parking Authority Law states as follows:

> The transfer of a certificate of public convenience, by any means or device, shall be subject to the prior approval of the authority which may, in its sole or peculiar discretion as it deems appropriate, attach such conditions, including the appropriate allocation of proceeds, as it may find to be necessary or proper.

53 Pa.C.S. § 5711(c)(5).

**3.** A "medallion taxicab" is authorized to "provide citywide taxicab service." 52 Pa. Code § 1011.2. A "partial-rights taxicab" is authorized to "provide common carrier call

or demand transportation of persons for compensation on a non-citywide basis," in other words, in a designated area of Philadelphia. *Id.* Bennett Taxicab is a partial-rights taxicab company.

Act 94 provided that partial-rights carriers would retain their rights to provide call or demand service within their designated area of Philadelphia. 53 Pa.C.S. § 5714(d)(2); *Germantown Cab Co. v. Philadelphia Parking Authority,* 993 A.2d 933, 935 n. 6 (Pa.Cmwlth. 2010). Partial-rights taxicabs cannot provide call and demand service in all of Philadelphia; only medallion taxicabs can provide point-to-point service throughout all of Philadelphia. *Sawink, Inc. v. Philadelphia Parking*

provide point-to-point service in Philadelphia to persons hailing one of its taxis so long as both points lie within the bounds of its small service area in Philadelphia. This distinguishes it from the 1,600 medallion taxicabs in Philadelphia that since 2004 have held certificates of public convenience issued exclusively by the Parking Authority. These certificates give medallion taxicabs the right to provide point-to-point service anywhere in the City of Philadelphia. The 2004 transfer of taxicab regulation did not impact Bennett Taxicab's ability to continue to operate in the service area listed in its pre–2004 certificate of public convenience issued by the Public Utility Commission.

In May 2008, Rosemont filed an application with the Public Utility Commission to acquire Bennett Taxicab's certificate of authority. Holding that Rosemont had the requisite technical expertise to provide service and a commitment to do so in a safe and legal manner, the Commission granted Rosemont's transfer application under 52 Pa.Code § 41.14.[4] The Commission determined that it lacked jurisdiction to approve the transfer of Bennett Taxicab's Philadelphia service area and direct-

ed Rosemont to present that request to the Parking Authority.

◼ Rosemont did so. The Parking Authority, by its Director of the Parking Authority's Taxicab and Limousine Division, denied the application. Rosemont appealed, and a hearing officer conducted a hearing on September 22, 2011, at which the Parking Authority had the burden of proving Rosemont unfit to operate in Philadelphia. A licensed utility is entitled to a presumption that it holds the technical and financial capacity and propensity to operate safely and legally, and it is the party opposing the utility's application that bears the burden of proof. *South Hills Movers*, 601 A.2d at 1310; *Lehigh Valley Transportation*, 56 A.3d at 58. In accordance with these principles, the parties stipulated that Rosemont enjoyed a presumption that it satisfied the standards in 52 Pa.Code § 41.14 and, thus, was fit to acquire Bennett Taxicab's service area in Philadelphia. The parties also stipulated that it was the Parking Authority's burden to rebut that presumption.

Jacob Gabbay, Rosemont's president, testified in support of Rosemont's applica-

---

*Authority*, 34 A.3d 926, 927 (Pa.Cmwlth. 2012).

Any taxicab with a certificate of public convenience from the Commission can deliver passengers to Philadelphia even though its service area does not include any part of Philadelphia. Section 5714(c) of the Parking Authority Law states as follows:

(d) Other vehicles.—

(1) A vehicle which is not authorized by a certificate to provide call or demand service within cities of the first class but which is operated by the holder of a certificate of public convenience from the Pennsylvania Public Utility Commission authorizing call or demand service elsewhere in this Commonwealth may transport persons and property:

(i) to cities of the first class in accordance with the service authorized under its certificate of public convenience; and

(ii) from any point in a city of the first class to any point in this Commonwealth beyond that city of the first class if the request for service for such transportation is received by call to its radio dispatch service.

53 Pa.C.S. § 5714(d). "Other vehicles" may not provide service that originates and terminates in Philadelphia; only medallion taxicabs can do that.

**4.** It found Rosemont to be "fit, willing and able to provide the service proposed." Commission Adjudication at 3, ¶ 1. It also found that "the applicant possesses the technical expertise, experience, facilities, sufficient capital and other resources necessary to provide the proposed service." Commission Adjudication at 3.

tion. He explained that he and his daughter, Tiffany Rachel Karsenty, each hold a 50% ownership interest in Rosemont. She and her husband, Avi Karsenty, manage Rosemont's day-to-day operations. Both Gabbay and the Karsentys have many years of experience in the taxicab business. Gabbay began his career as a cab driver in the 1970s, and he has owned and operated Germantown Cab Co., which has 130 taxicabs, for over 30 years.

Gabbay testified that over the years, Germantown Cab has filed various applications with the Public Utility Commission that required a showing that it had the requisite technical expertise and a commitment to operate safely and legally; each application has been granted by the Commission. This included his application to purchase 30 certificates of public convenience and medallions for city-wide service in Philadelphia.[5] During its 30+ years of operation, Germantown Cab has consistently operated as a certificate holder in good standing.

Rosemont owns approximately 30 taxicabs, and it operates separately from Germantown Cab from its own facility. Rosemont's garage employs mechanics who routinely inspect the vehicles, making any needed repairs they find. Gabbay removes vehicles from service when they develop mechanical problems that affect safety. Gabbay testified that "[s]afety is [the] number one" priority for Rosemont. Reproduced Record at 59 (R.R. ____).

Gabbay characterized his relationship with the Public Utility Commission as "excellent." R.R. 58–59. On the other hand, Gabbay acknowledged that he has had disagreements with the Parking Authority over its efforts to regulate Germantown Cab's operations in areas that Gabbay believes to be the responsibility of the Com-

mission. For example, Germantown Cab has challenged the Parking Authority's authority to order shields in all of its vehicles, which the Public Utility Commission does not require; to require Germantown Cab to comply with a driver certification program; and to require Germantown Cab to file certificate renewal applications in addition to the renewal it files with the Commission.

Gabbay explained that Germantown Cab and Rosemont have challenged citations issued by the Parking Authority that he believes non-meritorious. However, he explained that the companies abide by the ultimate court ruling, regardless of outcome. He also testified that were the courts to hold that limited service taxicab companies must bow to the standards of the Parking Authority, even when they conflict with the standards imposed by the Public Utility Commission, then Germantown Cab and Rosemont "will play by the rules" and "comply from A to Z." R.R. 92–93, 96.

Gabbay estimated that Germantown Cab and Rosemont together make over 2,000 trips every day. Since 2004, the companies have responded to every safety issue pointed out by the Parking Authority, even when they did not agree with the Parking Authority's exercise of authority. He stated that both companies have been operating lawfully within the bounds of their certificates of public convenience issued by the Public Utility Commission. Gabbay explained that Germantown Cab has a right to pick up or drop off passengers within its service area in Philadelphia; nevertheless, his drivers are frequently stopped and questioned by the Parking Authority's inspectors. Gabbay acknowledged that neither Rosemont nor German-

---

**5.** These were purchased before Act 94. It is unclear from the record whether the medal- lion cabs are currently owned by Germantown Cab or an affiliate.

town Cab is authorized to provide point-to-point service throughout the entire City and that he would fire a driver who did that, explaining that neither company tolerates such violations.

Gabbay's son, Joseph Gabbay, who helps to manage Germantown Cab, and on occasion, Rosemont, then testified. He explained that the Parking Authority issued three citations to Germantown Cab for alleged safety issues during the 2010–2011 fiscal year, and it appealed each citation. When asked whether Germantown Cab had $14,000 in outstanding parking tickets, Joseph Gabbay responded in the negative, explaining that because Germantown Cab is in the fleet program, individual taxicab drivers, not the company, are responsible for parking tickets issued to a vehicle.

For its part, the Parking Authority presented the testimony of its enforcement manager, William Schmid, who testified that the Parking Authority issued a citation to Rosemont on March 13, 2009, for providing unauthorized point-to-point service in Philadelphia, i.e., "outside of rights." In July 2009, the citation was adjudicated and resulted in a $500 fine. On April 2, 2009, the Parking Authority issued a second citation to Rosemont for operating outside of rights, and it resulted in a $1,000 fine. Schmid testified that the Parking Authority had issued ten other citations to Rosemont. Two citations were rescinded, and the others have not been adjudicated. One of the citations was issued for "operating outside of rights" to a vehicle with mileage over 267,000 miles, which is over the limit allowed by the Parking Authority, and with an expired state inspection sticker. However, it had not yet been adjudicated. In sum, during a period of three years, Rosemont has twice been adjudicated to have violated the Parking Authority Law for which it paid penalties in the amount of $1,500.

Schmid then testified about the 197 citations that the Parking Authority issued to Germantown Cab between August 2005 and August 2010. Of that total, 49 were safety related; 27 were for operating outside of rights; one was administrative; 10 related to drivers' certificates; 11 were meter violations; and 99 were for not appearing for a scheduled inspection with the Parking Authority. Schmid acknowledged that the 99 citations had been withdrawn with prejudice. Schmid did not know whether or how the remaining citations had been resolved.

The Parking Authority also presented the testimony of Christine Kirlin, who is a Deputy Manager for Administration and Adjudication. Kirlin testified that her records showed that Rosemont taxicabs had a total of $11,733.40 in outstanding parking tickets. Kirlin testified that there are two fleet programs in Philadelphia that allow taxicab companies to assign responsibility for parking tickets to the vehicle's driver. She did not know whether Rosemont was enrolled in the fleet program for taxicab companies that, like Rosemont, do not hold a certificate from the Parking Authority. Kirlin could not say whether the outstanding parking tickets were the responsibility of the driver or of Rosemont.

The hearing officer made a number of factual findings adverse to Rosemont. He found that "several citations" had been issued to Rosemont for operating outside of rights; that Rosemont owed over $11,733 in parking tickets; that Rosemont did not comply with the Parking Authority's driver certification program; that Rosemont had not requested a renewal certificate of public convenience from the Parking Authority; that Rosemont did not have its vehicles equipped with a protective barrier, or shield, as required by the Parking Authority; that Rosemont believes that the Parking Authority cannot

regulate the day-to-day operations of Rosemont; and that one of Rosemont's taxicabs was operating with an expired state inspection sticker and excessive mileage in August 2011.

With respect to Germantown Cab, the hearing officer found that in the past five years, Germantown Cab had been issued 49 safety violations and 11 meter violations, which were deemed "too many regardless of how many cabs are owned by Germantown Cab Co." Adjudication at 6; Finding of Fact 18. The hearing officer further found that a Germantown Cab taxicab was found to have a bald tire in March 2011; that Germantown Cab owed over $14,000 in parking violations; that Germantown Cab failed to comply with the driver certification program; that Germantown Cab had not requested a certificate of public convenience renewal from the Parking Authority; that Germantown Cab's vehicles lacked protective barriers as required by the Parking Authority; and that Germantown Cab believed the Parking Authority cannot regulate its day-to-day operations.

Based on these findings about Rosemont and Germantown Cab, the hearing officer concluded that Rosemont lacked the technical expertise to provide service in Philadelphia and lacked the commitment to provide safe and legal service. Therefore, the hearing officer denied Rosemont's application to acquire Bennett Taxicab's operating rights in Philadelphia. Rosemont petitioned for this Court's review.[6]

On appeal, Rosemont argues that the Parking Authority erred in several ways. First, Rosemont argues that many of the hearing officer's findings of fact are not supported by substantial evidence. The remaining factual findings do not support the Parking Authority's legal conclusion that Rosemont lacks the technical expertise to provide service in Philadelphia or the requisite commitment to safe and legal service. Second, Rosemont contends that the Parking Authority erred by relying upon citations, never adjudicated, that had been issued under an invalid regulation. Third, Rosemont argues that the Parking Authority does not have the power, or jurisdiction, to issue certificates of public convenience to, or regulate the operations of, partial rights taxicab companies that hold certificates of public convenience from the Public Utility Commission and operate mainly outside Philadelphia.

We begin with the regulation at 52 Pa. Code § 41.14(b), which sets forth the standards for review of a proposed acquisition for an existing certificate of authority. These standards are applied to new carriers and to carriers seeking to expand their existing service area. This regulation, promulgated by the Public Utility Commission, is also used by the Parking Authority as its own regulation.[7] It states as follows:

---

6. The Parking Authority functions as a Commonwealth agency in matters involving taxicabs. *Blount v. Philadelphia Parking Authority,* 600 Pa. 277, 289, 965 A.2d 226, 234 (2009). Our review of a Commonwealth agency adjudication is limited to determining whether constitutional rights were violated, agency procedures were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Sule v. Philadelphia Parking Authority,* 26 A.3d 1240, 1242 n. 4 (Pa.Cmwlth. 2011).

7. The Parking Authority established its own taxicab regulation in June 2005, but this Court subsequently ruled that regulation invalid and unenforceable. *Germantown Cab Co. v. Philadelphia Parking Authority,* 993 A.2d 933 (Pa.Cmwlth.2010), *affirmed,* 614 Pa. 133, 36 A.3d 105 (2012). The Parking Authority has used the Public Utility Commission's regulations until it has promulgated its own regulation. The parties have agreed that the Public Utility Commission's regulation was the proper regulation to use.

(b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service. In addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally. In evaluating whether a motor carrier applicant can satisfy these fitness standards, the Commission will ordinarily examine the following factors, when applicable:

(1) Whether an applicant has sufficient capital, equipment, facilities and other resources necessary to serve the territory requested.

(2) Whether an applicant and its employees have sufficient technical expertise and experience to serve the territory requested.

(3) Whether an applicant has or is able to secure sufficient and continuous insurance coverage for all vehicles to be used or useful in the provision of service to the public.

(4) Whether the applicant has an appropriate plan to comply with the Commission's driver and vehicle safety regulations and service standards contained in Chapter 29 (relating to motor carriers of passengers).

(5) An applicant's record, if any, of compliance with 66 Pa.C.S. (relating to the Public Utility Code), this title and the Commission's orders.

(6) Whether an applicant or its drivers have been convicted of a felony or crime of moral turpitude and remains subject to supervision by a court or correctional institution.

52 Pa.Code § 41.14(b). The operative standards are "technical and financial ability" and "a propensity to operate safely and legally." *Id.* The regulation then identifies factors to be considered in making this final determination. Rosemont entered the proceeding with the presumption that it had the technical expertise and the commitment to operate safely and legally in the service area of Philadelphia presently held by Bennett Cab.

■ Technical fitness means that Rosemont must have "sufficient technical and operating knowledge, staff and facilities to provide the proposed service." *Yellow Cab Company of Pittsburgh v. Pennsylvania Public Utility Commission,* 673 A.2d 1015, 1019 (Pa.Cmwlth.1996). Rosemont did not have to present any evidence on this standard because of the presumption it enjoyed. Nevertheless, it did so. It presented evidence on the experience of its management; about its drivers and mechanics; about its garage facilities; and about its financial resources. The Parking Authority presented no evidence to the contrary, and the presiding officer made no findings of fact on this issue. Nevertheless, the Parking Authority held that Rosemont lacks "the technical ability" to provide service. Adjudication at 8; Conclusion of Law 5. We reverse this holding as unsupported by any record evidence or findings of fact.

■ The phrase "lacks a propensity to operate safely and legally" means that the applicant has shown

*a persistent disregard for, flouting or defiant attitude, i.e.,* a natural inclination or innate or inherent tendency, to operate outside of safety and the law.

*Lehigh Valley Transportation,* 56 A.3d at 58 (internal quotation and citation omitted) (emphasis added). A settlement of one or two citations with a nominal civil penalty of $1,000 does not prove a propensity to operate outside of the law. *See, e.g., Mapemawa, Inc. v. Philadelphia Parking Authority,* 59 A.3d 1171, 1177–78 (Pa.Cmwlth. 2013).

Rosemont argues that the Parking Authority's evidence did not rebut the presumption that it possesses the requisite commitment to operate safely and legally. The sum total of the Parking Authority's evidence consists of two instances of operating outside of rights that resulted in fines totaling $1,500. The hearing officer's findings about other "violations" concerned Germantown Cab, which is not an "applicant" or a party to this proceeding. Even so, the record does not show any "violations" by Germantown Cab, only citations. The Parking Authority rejoins that Germantown Cab's compliance history is relevant. We conclude that substantial evidence does not support many of the Parking Authority's findings and that the findings that are supported by substantial evidence are not sufficient to rebut the presumption that Rosemont is fit to operate in a small part of Philadelphia.[8]

First, the regulation directs the Parking Authority to consider the "applicant's" compliance history, not that of the applicant's corporate affiliate. The Parking Authority looked to Germantown Cab's history because the two companies share some common principals. However, this approach cannot be reconciled with the plain language of 52 Pa.Code § 41.14(b), which directs a review only of the "applicant's" compliance history. This regulation is binding on the Parking Authority. Indeed, we have cautioned that the Commission and courts may not disregard "the independent entity of the corporate applicant." *Yellow Cab Company*, 673 A.2d at 1018. Rosemont and Germantown Cab are separate legal entities, have separate licensing histories and operate in different service areas.[9] Germantown Cab will not acquire any increase in service area by the

---

**8.** Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Mrs. Smith's Frozen Foods Company v. Workmen's Compensation Appeal Board (Clouser)*, 114 Pa. Cmwlth. 382, 539 A.2d 11, 14 (1988).

**9.** The dissent asserts that *Brink's Incorporated v. Pennsylvania Public Utility Commission*, 54 Pa.Cmwlth. 452, 421 A.2d 1244 (1980) (Judge Craig dissenting), established that the compliance history of applicant's affiliate can be attributed to the applicant. *Brink's Incorporated* is factually distinguishable. More importantly, it pre-dates the Public Utility Commission's promulgation of the regulation at 52 Pa.Code § 41.14(b), which limits the relevant compliance history to that of the "applicant."

In *Brink's Incorporated*, this Court reversed the Commission's grant of a certificate of public convenience to an armored truck carrier because that carrier's affiliate had willfully violated an order of this Court. Regarding the affiliate's unlicensed activity, Judge Craig's dissent reviewed a long line of precedent that had established that the "mere" fact that a carrier has acted "without commission approval is not per se equivalent to an offense which will prohibit absolutely the acquisition of proper authority when the application is subsequently made." *Id.* at 1246 (quotation

omitted). Stated otherwise, past violations are relevant evidence but are not dispositive of "an applicant's fitness." *Id.*

The Supreme Court reversed this Court in *Brink's Incorporated v. Pennsylvania Public Utility Commission*, 500 Pa. 387, 456 A.2d 1342 (1983). The Supreme Court noted that no party had challenged this Court's assumption that the acts of one corporation can be attributed to its affiliate. The Supreme Court did not endorse that assumption. However, even imputing the affiliate's conduct to the applicant, the applicant's record showed "fitness independent of the evidence relating to the period of [the affiliate's] unlawful operation." *Brink's Incorporated*, 500 Pa. at 392, 456 A.2d at 1344. In other words, the Supreme Court judged the applicant on its own compliance history. It also cited with favor Judge Craig's point that a prior negative compliance history is not dispositive of an applicant's fitness. The Supreme Court instructed that the purpose of reviewing an applicant's history is protection of the public, not punishment for past sins. *Id.* at 392 n. 3, 456 A.2d at 1344 n. 3. In other words, the history must be significant in order for the public to be at risk.

This case is factually distinguishable. The applicant in *Brink's Incorporated*, Brooks, was

transfer of Bennett Taxicab's operating authority to Rosemont. In short, Germantown Cab's compliance history is irrelevant, and it was error for the hearing officer to consider it.

■ Second, the two minor violations in Rosemont's own compliance history are inadequate to rebut the presumption that it will operate safely and legally. There is no evidence of the Public Utility Commission issuing any citations to Rosemont, and this is significant because presently it is regulated exclusively by the Commission. The hearing officer refers to "several citations" issued by the Parking Authority but without specifics. Adjudication at 6; Finding of Fact 19. The only evidence on these citations came from the testimony of Schmid, who testified that in the past three years, the Parking Authority has issued two citations to Rosemont for operating "outside of rights" that actually resulted in a finding of liability and the payment of two fines totaling $1,500. Further, these adjudged citations had nothing to do with safety. Two adjudicated violations over the span of three years do not demonstrate "a persistent disregard for, flouting or defiant attitude" toward the law, which is the hallmark of a "propensity" to operate outside the law. *Lehigh Valley Transportation,* 56 A.3d at 58.

The hearing officer found that Rosemont had failed to apply for a renewal of a certificate of public convenience from the Parking Authority; had failed to comply with the Parking Authority's driver certification program; and had failed to install shields in its vehicles. These findings are misplaced and an example of the careless work seen throughout in the Parking Authority's adjudication. Rosemont does not hold a certificate of public convenience from the Parking Authority and, thus, the Parking Authority does not regulate it. Rosemont operates solely under a certificate of public convenience issued by the Public Utility Commission, and it does not require shields in taxicabs. The Parking Authority has no more authority, at present, over Rosemont than it does over any taxicab that happens to deliver a passenger to Philadelphia. Taxicabs that are licensed by the Commission do not become the business of the Parking Authority simply by crossing the border of Philadelphia.[10]

---

a new entrant into the business of providing armored carrier service, and it needed a license so that it could take over the business of its corporate affiliate, WFB. It was WFB that continued to offer armored car service without a license and in violation of this Court's order. Rosemont is not a new entrant, and it is not taking over the business of Germantown Cab. Unlike Brooks, Rosemont has a three-year history of operating under a Pennsylvania license and enjoys a presumption that it is fit to provide service in Philadelphia. Unlike Brooks, Rosemont did not have the burden of proof. Germantown Cab has chosen to litigate the dual system of regulation the Parking Authority seeks to impose on it. This does not make it similar to WFB, which defied court orders. The Parking Authority offered no evidence that Germantown Cab is in violation of any orders. Finally, Rosemont is not taking over Germantown Cab but, rather, Bennett Taxicab.

Most importantly, at the time this Court decided *Brink's Incorporated,* the Public Utility Commission had not promulgated its regulation at 52 Pa.Code § 41.14(b). The regulation is clear that it is solely the record of the *applicant* that is to be considered in determining whether to grant a certificate of public convenience. This is consistent with our holding in *Yellow Cab Company,* 673 A.2d at 1018, that the affiliate of "the corporate applicant" is not the same legal person as the applicant.

**10.** *See* n. 3, *infra.,* which explains that 53 Pa.C.S. § 5714(d) gives the right to any taxicab licensed by the Commission to deliver passengers to Philadelphia and from Philadelphia to any point in the Commonwealth if the

The hearing officer's finding that Rosemont is liable for $11,733.40 in parking tickets is not supported by substantial evidence. The Parking Authority's witness, Christine Kirlin, testified that she did not know if the outstanding parking tickets were the responsibility of Rosemont or its drivers.

Third, although not relevant for the reasons stated above, Germantown Cab's compliance history is likewise insufficient to deprive Rosemont of a license. The hearing officer found that between August 2005 and August 2010, the Parking Authority had found "[f]orty-nine safety violations and 11 meter violations [which] are too many regardless of how many cabs are owned by Germantown Cab Co." [11] Adjudication at 6; Finding of Fact 18. The "violations" cited by the hearing officer were *citations*, not adjudicated violations. The hearing officer made no findings about the outcome of the above-listed citations because he could not do so; the testimony was lacking. Further, the hearing officer stated that he would not read the document dump offered by the Parking Authority, which consisted of two inches of a computer printout. Schmid testified that he did not know how or if these citations were resolved. He did not testify about a single adjudicated violation by Germantown Cab. A statement in a citation has no more evidentiary weight than does a statement in a civil complaint filed in a court of law, which is to say none at all.

Further, contrary to the hearing officer's statement, the number of vehicles in a taxicab company's fleet is relevant to a determination of whether an applicant's compliance history contains "too many" violations. Germantown Cab and Rosemont together make 2,000 trips a day. Most of these are made by Germantown Cab, which has 130 cabs in its fleet; Rosemont has 30 cabs. Germantown Cab's record of 49 citations over a five-year period must be measured against the thousands of trips made each day by 130 taxicabs. It works out to a compliance record that is better than 99% positive, even assuming all citations were adjudged to be actual violations by Germantown Cab. [12]

The Parking Authority did not rebut any of this evidence. The Parking Authority presented no evidence about the frequency and severity of the citations it has issued to other taxicab companies. Absent that evidence, the hearing officer lacked any foundation in the record for his bald assertion that 49 "violations" (which were actually citations) were "too many" regardless of the number of taxicabs in Germantown Cab's fleet. [13] This observation is not even logical.

Germantown Cab and the Parking Authority have a history of litigation concerning the extent of the Parking Authority's authority to regulate the operations of Germantown Cab, if at all. Gabbay testified that he believes the Public Utility Commission, not the Parking Authority, is primarily responsible to regulate Germantown Cab and, thus, has challenged the Parking Authority's demand that it install shields in its cabs, register its drivers and

---

request is received by the radio dispatch service.

**11.** The record is devoid of evidence on the nature of these so-called safety violations. It could be nothing more serious than a broken taillight.

**12.** The Parking Authority cited Germantown Cab for three safety violations in 2010–2011, but each citation has been appealed.

**13.** It is undisputed that the Parking Authority has not acted to suspend or revoke Germantown Cab's certificate of public convenience, which the Parking Authority asserts it has had the right to do since 2005.

renew a certificate of convenience, of which it has no record. Gabbay testified that Germantown Cab will comply if the litigation is unsuccessful. Respect for law does not mean that one must accept without question a bureaucrat's view of the law, thereby giving the state agency the ability to rule by fiat. Engaging in litigation actually demonstrates respect for the rule of law.

In sum, we hold that Rosemont's two adjudicated citations, which resulted in a fine of $1,500, were inadequate to rebut the presumption that Rosemont has a commitment to operate in a safe and legal manner. We reverse the Parking Authority's contrary conclusion.

In its second issue, Rosemont argues that the Parking Authority erred in relying upon any "violations" of Germantown Cab and Rosemont because they were all initiated under its regulation later ruled void and unenforceable in *Germantown Cab Co. v. Philadelphia Parking Authority,* 993 A.2d 933 (Pa.Cmwlth.2010), *affirmed,* 614 Pa. 133, 36 A.3d 105 (2012). The record does not contain information about whether Rosemont's two adjudicated citations for "operating outside of rights" were violations of the invalidated regulation. It does not matter. We have concluded that the two adjudicated citations, or violations, are inadequate, as a matter of law, to overcome the presumption that Rosemont has the requisite commitment to safe and legal operations. Accordingly, we need not decide what effect, if any, our holding in *Germantown Cab Co.* would have on those two adjudicated violations.

Finally, we turn to Rosemont's third issue, *i.e.,* that the Parking Authority lacks the authority to approve the transfer of a service area in Philadelphia that is contained in the certificate of public convenience of a partial rights taxicab company, such as Bennett Taxicab, issued by the Public Utility Commission. In its main brief, Rosemont argued that Act 94 grandfathered these taxicab companies' right to operate in their small service areas in Philadelphia and, thus, the approval of a transfer by the Public Utility Commission is all that Rosemont needs to operate in Bennett Taxicab's service area. Because partial rights taxicab companies are regulated solely by the Public Utility Commission, Rosemont argued that the Parking Authority lacks the ability to duplicate or override the regulatory standards of the Commission. However, because of amendments to the Parking Authority Law on certificates of authority, Rosemont withdrew this part of its appeal in its reply brief. Rosemont now agrees that the Parking Authority has authority to pass on the transfer of Bennett Taxicab's service area in Philadelphia to Rosemont. Accordingly, we need not address the issue of the Parking Authority's authority to approve the transfer of Bennett Taxicab's service area in Philadelphia to Rosemont.

For the reasons stated above, the order of the Parking Authority is reversed.

### *ORDER*

AND NOW, this 22nd day of May, 2013, the order of the Philadelphia Parking Authority in the above-captioned matter is hereby REVERSED and the matter is REMANDED for approval of the transfer of operating rights from Concord Coach USA t/a Bennett Taxicab to Rosemont Taxicab Co., Inc. in their entirety.

Jurisdiction relinquished.

DISSENTING OPINION BY President Judge PELLEGRINI.

I respectfully dissent because it was appropriate for the Philadelphia Parking Authority (Authority) to consider Germantown Cab Co.'s (Germantown) compliance

history in determining whether Rosemont Taxicab Co., Inc. (Rosemont) has a propensity to operate safely and legally and the Authority's determination in this regard is supported by substantial evidence.

First, in *Brink's Incorporated v. Public Utility Commission*, 54 Pa.Cmwlth. 452, 421 A.2d 1244 (1980), *rev'd on other grounds*, 500 Pa. 387, 456 A.2d 1342 (1983), this Court held that the actions of one corporation with respect to its fitness to operate as a contract carrier applied to a second corporation where the officers and directors of both of the corporations were the same or substantially the same and the 100% shareholder of one corporation owned 85% of the shares of the second corporation. The majority's reliance on *Yellow Cab Company of Pittsburgh v. Public Utility Commission*, 673 A.2d 1015, 1018 (Pa.Cmwlth.1996), is misplaced because, in that case, this Court precluded piercing the corporate veil to attribute the past illegal activities personally committed by a corporation's principal in considering whether the corporation lacks a propensity to operate safely and legally.

As noted by the majority in this case, Rosemont's president, Jacob Gabbay (Gabbay), and his daughter, Tiffany Karsenty, each own 50% of Rosemont's stock; Gabbay has also owned Germantown for over 30 years as its sole shareholder; and Gabbay's son, Joseph Gabbay, helps in the management and operation of both Rosemont and Germantown. As a result, contrary to the majority's assertion, it was appropriate for the Authority to consider Germantown's compliance history in determining Rosemont's propensity to operate safely and legally.

Second, with respect to its propensity to operate safely and legally, Rosemont claims that the Hearing Officer's determination that it does not possess such a propensity is not supported by substantial evidence because it is based on the violation of regulations that were held to be invalid in *Germantown Cab Co. v. Philadelphia Parking Authority*, 993 A.2d 933 (Pa.Cmwlth.2010), *aff'd*, 614 Pa. 133, 36 A.3d 105 (2012).[1] Under 52 Pa.Code § 41.14 of the Public Utility Commission's (Commission) regulations,[2] an applicant

---

1. In *Germantown Cab Co.*, the Authority cited, fined and suspended Germantown from operating one of its taxicabs for 30 days because the Authority found that Germantown violated one of the Authority's regulations. Germantown challenged the adjudication on the ground that the Authority failed to properly promulgate the regulation in accordance with what is commonly referred to as the Commonwealth Documents Law (CDL), Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602, and 45 Pa.C.S. §§ 501–907. *Germantown Cab Co.*, 993 A.2d at 934. We concluded that the Authority was required to follow the requirements of the CDL when it adopted the regulation. Because the Authority failed to do so, we determined that "the Authority's taxicab regulation does not have the force and effect of law; it is not 'valid for any purpose.'" *Id.* at 943 (citation omitted). Accordingly, we held that the regulation was void and unenforceable and reversed the Au-

thority's order imposing sanctions on Germantown. *Id.*

2. Specifically, 52 Pa.Code § 41.14(b)(4) and (5) states, in pertinent part:

    (b) An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service. In addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally. In evaluating whether a motor carrier applicant can satisfy these fitness standards, the Commission will ordinarily examine the following factors, when applicable:

    \* \* \*

    (4) Whether the applicant has an appropriate plan to comply with the Commission's driver and vehicle safety regulations and service standards contained in Chapter

seeking a motor carrier authority must establish public demand or need for the proposed service, its technical and financial ability to provide the proposed service, and a propensity to operate safely and legally. *Loma, Inc. v. Public Utility Commission,* 682 A.2d 424, 431 (Pa.Cmwlth.1996), *appeal denied,* 548 Pa. 675, 698 A.2d 597 (1997). However, where, as here, the applicant seeks a transfer of an existing certificate of public convenience, it is presumed that there is a continuing public demand and need for the service. *Id.* Likewise, where, as here, the applicant has previously been granted authority to operate and seeks approval of additional authority, there is continuing presumption that the applicant is technically and financially fit for the service. *Id.* In short, the burden was on the Authority to show that Rosemont does not possess a propensity to operate safely and legally.

Based on the evidence presented, the Hearing Officer found: over the past five years, approximately 250 violations were issued to Germantown for safety violations and operating outside of rights; as of August 2010, 197 citations were issued to Germantown, ten for driver certifications, 49 for safety violations, 27 for operating outside of rights, one administrative violation, and 11 meter violations;[3] in March 2011, a Germantown cab was operating with a bald tire in violation of the Department of Transportation's regulations, 67 Pa.Code § 175.80(e)(1)(i);[4] in August 2011, a Rosemont cab was operating with an expired inspection sticker in violation of the Commission's regulations, 52 Pa.Code § 29.405[5] and with over 267,000 miles, in excess of the Authority's 250,000–mile limit; Rosemont owes over $11,733.00 for parking violations;[6] Germantown owes over $14,000.00 for parking violations; Germantown and Rosemont failed to comply with the Authority's driver certification program under Section 5706(a) of the Parking Authority Law, 53 Pa.C.S. § 5706(a);[7] Germantown and Rosemont failed to file an application for certificate of public convenience renewal; and Germantown's and Rosemont's vehicles are not equipped with a protective shield as required by Section 5714(b) of the Parking Authority Law, 53 Pa.C.S. § 5714(b).[8]

---

29 (relating to motor carriers of passengers).

(5) An applicant's record, if any, of compliance with 66 Pa.C.S. (relating to the Public Utility Code), this title and the Commission's orders.

3. The Hearing Officer found that 99 additional citations for failing to appear for inspection were later withdrawn.

4. 67 Pa.Code § 175.80(e)(1)(i) states: "Inspect the tires and wheels and reject if one or more of the following apply: ... A tire has two adjacent treads with less than 2/32–inch tread remaining at any point—less than 4/32–inch tread on the front tires of the vehicles having a gross weight in excess of *10,000 pounds....*"

5. 52 Pa.Code § 29.405 states, "Common carriers and contract carriers shall insure that vehicles operated under their certificates or permits receive the annual State inspection required by 75 Pa.C.S. Chapter 47 (relating to inspection of vehicles)."

6. The Hearing Officer found that Rosemont is not registered as part of the "fleet program" whereby the Authority transfers liability for a ticket to the lessee of the company's vehicle.

7. 53 Pa.C.S. § 5706(a) states, in relevant part, that "[t]he authority shall provide for the establishment of a driver certification program for drivers of taxicabs ... in cities of the first class.... No individual shall operate a taxicab or limousine at any time unless the individual is certified as a driver by the authority...." The City of Philadelphia is the only city of the first class. *See Blount v. Philadelphia Parking Authority,* 600 Pa. 277, 279 n. 4, 965 A.2d 226, 228 n. 4 (2009).

8. 53 Pa.C.S. § 5714(b) states, in relevant part, that "[e]ach taxicab within cities of the first class shall be equipped with a protective bar-

The Hearing Officer specifically noted that "[f]orty nine safety violations and 11 meter violations are too many regardless of how many cabs are owned by Germantown Cab Co." (Certified Record (C.R.) at 1158.) All of the foregoing findings are amply supported by the certified record of this case. (*Id.* at 62–64, 143, 153, 180, 183, 865–882, 922–1004, 1155). Accordingly, the Hearing Officer properly denied the application because the Authority's Taxicab and Limousine Division rebutted the presumption that Rosemont possesses a propensity to operate safely and legally, and Rosemont failed to demonstrate that it has the technical ability to provide the proposed service, that it has a plan to comply with the standards in the Parking Authority Law, or that it has the propensity to operate safely and legally.

To counter this evidence, Rosemont contends that the evidence was not substantial because those citations were to regulations that we found to be improperly promulgated under *Germantown Cab Co.* However, the record shows that of the 49 safety violations, only six were appealed to this Court, and of the 11 meter violations, only one was appealed to this Court. (C.R. at 865–883, 922–1004.) As to the unappealed violations, they constitute substantial evidence of Rosemont's unfitness and support the Hearing Officer's decision because to hold otherwise would permit a collateral attack on these final adjudications and, even if they were decided under regulations found not to be valid under *Germantown Cab Co.*, they still constitute substantial evidence as final adjudications. *See Department of Environmental Protection v. City of Philadelphia*, 692 A.2d 598, 604 (Pa.Cmwlth.1997) ("We agree that an aggrieved party has no duty to appeal but disagree that upon failure to do so, the party so aggrieved preserves to some in-definite future proceedings the right to contest an unappealed order. To conclude otherwise would postpone indefinitely the vitality of administrative orders and frustrate the orderly operation of administrative law. . . .") (citation omitted). As to the appealed decisions, there was no evidence in the record as to the outcome on appeal presented by Rosemont, so those violations also constitute substantial evidence of Rosemont's unfitness.

Finally, and most importantly, those violations of the Commission's regulations and the Parking Authority Law remain in place because direct violations of those regulations and that statute remain valid in spite of our holding in *Germantown Cab Co. See* 993 A.2d at 943 (holding that the Authority is still empowered to initiate enforcement actions for direct violations of the Parking Authority Law or of the Commission's regulations that were to remain in effect until replaced by the Authority's regulations). Because Rosemont did not show that the Authority's evidence was not sufficient to support the Hearing Officer's determination that Rosemont did not possess the propensity to operate safely and legally, the Hearing Officer did not err in reaching this conclusion.

Accordingly, unlike the majority, I would affirm the Authority's order.

rier for the protection of the driver, separat-

ing the front seat from the back seat. . . ."